RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0069p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

         *Plaintiff-Appellee,*

    *v.*

OLIVER HIGGINS,

         *Defendant-Appellant.*

No. 08-5114

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 06-10004-001—James D. Todd, District Judge.

Argued: January 21, 2009

Decided and Filed: February 26, 2009

Before: MOORE, CLAY, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Keith E. Golden, GOLDEN & MEIZLISH, Columbus, Ohio, for Appellant. Jerry R. Kitchen, ASSISTANT UNITED STATES ATTORNEY, Jackson, Tennessee, for Appellee. **ON BRIEF:** Keith E. Golden, GOLDEN & MEIZLISH, Columbus, Ohio, for Appellant. Jerry R. Kitchen, ASSISTANT UNITED STATES ATTORNEY, Jackson, Tennessee, for Appellee.

    MOORE, J., delivered the opinion of the court. CLAY, J. (pp. 24-26), delivered a separate opinion which joins Part II.A.2.a but dissents from Part II.A.2.b. KETHLEDGE, J. (pp. 27-28), delivered a separate opinion which joins all but Part II.A.2.a.

_____

## OPINION

_____

    KAREN NELSON MOORE, Circuit Judge. In 2006, Oliver Higgins ("Higgins") was indicted and charged with six counts: possession with intent to distribute cocaine base, possession with intent to distribute cocaine, possession with intent to distribute marijuana,

1

possession of counterfeit currency with intent to defraud, felon in possession of a firearm, and possession of a firearm in connection with a drug-trafficking crime. Before trial, Higgins moved to suppress all of the evidence stemming from the search of his apartment on the grounds that the warrant lacked probable cause. The district court denied this motion. At trial, the jury convicted Higgins of five of the six counts (all of the counts except the third, marijuana-based crime). The district court sentenced Higgins to an effective sentence of life imprisonment plus five years.

On appeal, Higgins raises two arguments. First, Higgins asserts that the district court erred in denying his motion to suppress because the search warrant lacked probable cause. Second, Higgins presents three arguments for why the district court erred in imposing a sentence of life imprisonment: (1) although the jury convicted Higgins of an offense involving cocaine base, his sentence violated the Sixth Amendment because it was based on a judicial finding that the offense involved crack cocaine; (2) Higgins's sentence was greater than necessary, and the district court failed to consider mitigating factors; and (3) the district court improperly enhanced Higgins's sentence based on prior convictions. For the reasons discussed below, we **AFFIRM** Higgins's conviction and sentence.

## I. BACKGROUND

The chain of events leading to Higgins's conviction began in 2005, when an investigator with the Jackson Police Department and an Assistant District Attorney contacted Investigator William Carneal ("Carneal") at the Madison County Sheriff's Department. The investigator told Carneal that an officer with the Henderson Police Department had information about drugs being sold in Madison County. Carneal explained the events that transpired in his affidavit supporting the application for a search warrant:

> On September 9, 2005, Sgt. Carneal received information from the Henderson Police Department (Chester County) regarding a traffic stop conducted in that jurisdiction in which Officer Phil Willis of the Henderson Police Department recovered a large amount of cocaine and cocaine base. Officer Willis stated that he stopped a suspect for driving under the influence. Officer Willis informed Sgt. Carneal that the suspect had approximately 15 grams of powder cocaine, along with 26 grams of cocaine base. (Both substances field tested positive for cocaine). The suspect also had two additional passengers in the vehicle. All three individuals were separated and interviewed separately at the Chester County Sheriff's

Department. The driver of the vehicle, whose name has been disclosed to the Judge, stated he picked up the cocaine from a location in Madison County and gave an address of 1336 Campbell Street, Apartment 5, Jackson, Tennessee, as the pick up location for the narcotics. He also identified the person selling the narcotics as Oliver Higgins. This information was corroborated by both passengers of the vehicle who stated they rode with the driver to the Campbell Street location. Officers from Metro Narcotics did transport the driver of the vehicle to the Campbell Street address to confirm the exact location of the transaction. Officers with the Metro Narcotics Unit corroborated the address given by the driver of the vehicle, along with the description of a motorcycle which belonged to Oliver Higgins. Officers with Metro Narcotics did identify the motorcycle as belonging to Oliver Higgins and which was located at 1336 Campbell Street, Apartment 5, Jackson, Tennessee. The driver stated he had purchased narcotics from this location previously and had purchased the cocaine in his vehicle on September 9, 2005 from Oliver Higgins. A check of the criminal history of Oliver Higgins showed two prior felony convictions for narcotics trafficking in Hardin County, Tennessee, in 1990 and 1998.

Joint Appendix ("J.A.") at 36 (Carneal Aff.).

Based solely on this affidavit, the Madison County General Sessions Judge issued a warrant to search apartment 5 at 1336 Campbell Street. According to Carneal's trial testimony, when the police searched this apartment, they found crack cocaine, powder cocaine, marijuana, money, a gun, digital scales, rolling papers, and mail addressed to Higgins. After the officers discovered more than 100 grams of crack cocaine, they arrested Higgins and took him to the Criminal Justice Complex.

Based on the contraband discovered during this search, a federal grand jury delivered a superseding indictment charging Higgins with six counts: possession with intent to distribute 531.8 grams of cocaine base in violation of 21 U.S.C. § 841(a)(1); possession with intent to distribute 250.1 grams of cocaine in violation of 21 U.S.C. § 841(a)(1); possession with intent to distribute 62 grams of marijuana in violation of 21 U.S.C. § 841(a)(1); possession of counterfeit currency with intent to defraud in violation of 18 U.S.C. § 472; felon in possession of a firearm in violation of 18 U.S.C. § 922(g); and possession of a firearm in connection with a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1)(2).

After he was indicted, Higgins moved to suppress all of the evidence that was seized during the search described above; all of the statements he made at the scene of the search or later, while in custody; and all observations made by law enforcement officers during the

search.  Higgins argued that the search was improper because the warrant lacked probable cause and did not sufficiently corroborate the statements made by the informant.  The government responded that the affidavit provided probable cause because the informant's name was disclosed to the judge, the information given was based on the informant's personal knowledge, officers corroborated the fact that Higgins lived at the named location, and Higgins had two prior felony convictions for drug trafficking.  Additionally, the government asserted that corroboration was not necessary because the informant was "providing information in hopes of leniency for past crimes."  J.A. at 40 (Resp. to Mot. to Suppress at 4).

The district court held a hearing on Higgins's motion to suppress at which Carneal was the sole witness.  Carneal's testimony was consistent with the information contained in the affidavit.  After argument from counsel, the district court reviewed the facts contained in the affidavit and noted that "the informant was identified" and that the information he provided "was corroborated by taking him and others to the address" and by the identification of Higgins's motorcycle.  J.A. at 100 (Hr'g Tr. at 27).  The district court denied the motion and found that "an identified informant providing corroborated information" established probable cause.[1]  J.A. at 101 (Hr'g Tr. at 28).

The case proceeded to trial.  The government's first witness was Jessica Lynn Marquez, a Tennessee Bureau of Investigation employee.  Marquez testified that one of the government's exhibits contained 250.1 grams of cocaine, that another contained 62 grams of marijuana, and that a third contained 531.8 grams of cocaine base. Additionally, Marquez explained that cocaine base was made by boiling water, powder cocaine, and baking soda together and that when the mixture dried, it was "hard and rock-like."  J.A. at 112 (Trial Tr. at 6).  During her testimony, the substance Marquez tested was referred to as both cocaine base and as crack cocaine.  Marquez herself called the substance cocaine base, but when the prosecutor asked her to state "the total amount of crack cocaine" that she had tested, Marquez stated that the total was 531.8 grams

---

[1]After this ruling, Higgins filed an amended motion to suppress and a motion to reopen the suppression hearing based on ineffective assistance of counsel.  The district court denied these motions.

without making any distinction between crack cocaine and cocaine base. J.A. at 113 (Trial Tr. at 7).

After Marquez, Carneal testified regarding the search of Higgins's apartment. Carneal also explained the difference between powder cocaine and crack cocaine and described how crack cocaine is made. Carneal stated that Higgins was in the apartment at the time of the search and that Higgins told officers that he was the sole occupant. The government's next witness was Joseph Cavitt ("Cavitt"), a United States Secret Service special agent, who testified regarding the counterfeit currency found in Higgins's apartment.

After Cavitt, the government called Terry Hopper ("Hopper"), a task officer with the Drug Enforcement Administration, to the stand. Hopper testified that he was present when the search warrant was executed at Higgins's apartment. Hopper explained how crack cocaine was made and sold, and Hopper stated that "over 550 grams of crack cocaine" were found in Higgins's apartment and that this quantity of drugs was worth about $50,000. J.A. at 167 (Trial Tr. at 193). According to Hopper, the powder cocaine found was worth about $30,000. Additionally, Hopper told the jury that the items found in the apartment indicated to him that Higgins "was selling crack cocaine." J.A. at 168 (Trial Tr. at 194).

The district court then charged the jury and explained that "Count 1 charges the defendant, Oliver Higgins, on or about September 10, 2005, unlawfully, knowingly and intentionally possessed with intent to distribute approximately 531.8 grams of cocaine base, or crack cocaine." J.A. at 175 (Trial Tr. at 239). The jury found Higgins guilty of five of the six counts with which he had been charged, but acquitted him of count 3, the marijuana-based charge. In connection with count 1, the verdict form required the jury to answer two questions. First: "On Count 1 of the indictment, we, the jury, find the defendant Oliver Higgins. . . ." J.A. at 71-72 (Verdict Form). The jury checked a box indicating that it found Higgins guilty on count 1. Second: "If you find defendant guilty on Count 1, what amount of cocaine base do you find beyond a reasonable doubt that

defendant possessed?" *Id.* The jury responded that it found 531.8 grams. The jury answered similar questions for the remaining charges.

The district court began the sentencing hearing by reviewing the conclusions contained in the presentence report ("PSR"). The PSR asserted that the combined adjusted offense level was 34. According to the PSR, because "[Higgins's] instant offense of conviction is a felony controlled substance offense and [Higgins] has at least two prior felony convictions of a controlled substance offense," Higgins should be classified as a Career Offender under U.S.S.G. § 4B1.1. J.A. at 232-33 (PSR at 9-10). Using the calculations for Career Offenders, the PSR assigned Higgins a total offense level of 37. The report also stated that because Higgins was categorized as a Career Offender, his criminal history category was VI. In summarizing the district court's sentencing options, the PSR noted that based on 21 U.S.C. §§ 841(b)(1)(A) & 851(a)(1), count 1 carried a mandatory-minimum sentence of life imprisonment. Similarly, under 21 U.S.C. § 924(c)(1)(A)(1), Higgins's conviction for possession of a firearm in connection with a drug-trafficking crime (count 6) required a sentence of at least five years of imprisonment to run consecutively with his other sentences. The PSR stated that Higgins's guidelines range was 360 months to life plus five years of consecutive imprisonment. However, the PSR asserted that based on the statutory minimums described above, the district court was required to impose a sentence of life imprisonment plus five years to run consecutively.

After reviewing the PSR, the district court heard argument from both sides. Higgins argued that because the jury had not found that the substance involved in count 1 was crack cocaine, the district court could not sentence Higgins based on enhancements intended for crack-cocaine-based offenses. The government countered that the terms "crack cocaine" and "cocaine base" had been used interchangeably at trial. The district court overruled Higgins's objection because the district court found that "there was evidence in this record that the substance possessed by defendant was, in fact, the crack form of cocaine base" and because under the guidelines, cocaine base was defined as crack cocaine. J.A. at 196-97 (Trial Tr. at 287-88).

Next, Higgins and the government presented arguments regarding the propriety of a sentence of life imprisonment. The government focused on the fact that the appropriate penalty was harsh not because of a sentencing disparity between powder cocaine and crack cocaine, but because Higgins was a career offender. The district court noted that 21 U.S.C. § 841(b)(iii) required a sentence of life imprisonment because Higgins had been convicted of possessing more than 50 grams of cocaine base and had two prior drug-related convictions. Higgins continued to argue that although this statute used the term "cocaine base," the district court could not impose a mandatory life sentence absent a jury finding that the drug involved was crack cocaine because the statutory minimum of life imprisonment was meant for offenders involved in crack cocaine.

In imposing sentence, the district court noted that the guidelines were just one factor for the court to consider and that here the guidelines "suggest[ed] . . . a mandatory sentence of life in prison plus five more years for the firearm." J.A. at 213 (Trial Tr. at 304). The district court considered the circumstances of the offense, focusing on the fact that guns and a large quantity of drugs were found at Higgins's apartment. Additionally, the district court considered Higgins's history and noted that he had a serious and lengthy criminal record. The district court stated that there were no appropriate alternative sentences available and determined that Higgins's sentence was proportional to the sentences of other individuals who had committed similar crimes. Finally, the district court noted the importance of deterring large-scale drug dealers and imposed the following sentence:

> In looking at what your sentence should actually be, the guidelines suggest life, *but even more importantly, the statute in your case requires life.* [21 U.S.C. § 841(b)(1)(A)(iii)] provides the penalty for 50 grams or more of cocaine base and, in the next column, . . . provides for a mandatory sentence of life in prison if you have two prior convictions for a felony drug offense. You clearly have those two prior felony convictions, and you were convicted in this case of more than 50 grams of cocaine base. So, *under the statute, the court has no alternative but to impose a sentence of life.*
> The statute also requires a five-year additional sentence to be served consecutively for the firearm.

So, Mr. Higgins, considering all the factors of [18 U.S.C. § 3553] and the guidelines, it's my judgment that you be committed to the custody of the Bureau of Prisons for a term of life imprisonment on count 1, thirty years imprisonment on count 2, twenty years imprisonment on count 4, fifteen years imprisonment on count 5, all of those sentences to be served concurrently with each other, followed by a five-year sentence consecutive on count 6, which will be served consecutively to the life. The effective sentence is, therefore, life imprisonment plus five years.

J.A. at 215-16 (Trial Tr. at 306-07) (emphasis added).

On appeal, Higgins raises two arguments. First, Higgins asserts that the district court erred in denying his motion to suppress because the search warrant was not supported by probable cause. Second, Higgins presents three arguments contending that the district court erred in imposing a sentence of life imprisonment: (1) although the jury convicted Higgins of an offense involving cocaine base, his sentence violated the Sixth Amendment because it was based on a judicial finding that the offense involved crack cocaine; (2) Higgins's sentence was greater than necessary, and the district court failed to consider mitigating factors; and (3) the district court improperly enhanced Higgins's sentence based on prior convictions.

## II.  ANALYSIS

### A.  Motion to Suppress

#### 1.  Standard of Review

"When reviewing a district court's decision on a motion to suppress, we use a mixed standard of review:  we review findings of fact for clear error and conclusions of law de novo."  *United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008).  The district court's finding that there was probable cause to support the warrant is reviewed de novo. *United States v. Hardin*, 539 F.3d 404, 416-17 (6th Cir. 2008).  We view the evidence "in the light most likely to support the district court's decision."  *Davis*, 514 F.3d at 607 (internal quotation marks omitted).  "An issuing judge's findings of probable cause should be given great deference by the reviewing court and should not be reversed unless arbitrarily exercised."  *United States v. Miller*, 314 F.3d 265, 268 (6th Cir. 2002), *cert.*

*denied*, 539 U.S. 908 (2003). "'[A] denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for any reason.'" *Hardin*, 539 F.3d at 417 (quoting *United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir. 1994)).

## 2. Analysis

### a. Probable Cause

The Fourth Amendment requires that a warrant must be supported by probable cause, i.e., "a fair probability that contraband or evidence of a crime will be found in a particular place." *Miller*, 314 F.3d at 268 (internal quotation marks omitted). The Supreme Court has held that the sufficiency of a warrant is analyzed using a totality-of-the-circumstances approach; "the duty of a reviewing court is simply to ensure that the [issuing] magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). When a search warrant issues based on an informant's tip, that informant's "'veracity,' 'reliability,' and 'basis of knowledge' are all highly relevant," but are not "separate and independent requirements to be rigidly exacted in every case." *Id.* at 230. In applying this totality-of-the-circumstances test, this court has held that "where a known person, named to the magistrate, to whose reliability an officer attests with some detail, states that he has seen a particular crime and particular evidence, in the recent past, a neutral and detached magistrate *may* believe that evidence of a crime will be found." *United States v. Allen*, 211 F.3d 970, 976 (6th Cir. 2000) (en banc).

As in *Allen*, in Higgins's case, the affidavit was based on information provided to law-enforcement officers by an informant who was known to the affiant and whose name was disclosed to the issuing magistrate. *See Allen*, 211 F.3d at 971-72. However, Higgins's case is different from *Allen* in two critical respects. First, unlike the affidavit in *Allen*, Carneal's affidavit did not attest to the informant's reliability. The Supreme Court has held that "[a]dmissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable

cause to search." *United States v. Harris*, 403 U.S. 573, 583 (1971). However, when considering *Harris*, this court has held that "[a]n admission against penal interest . . . is a significant, *and sometimes conclusive*, reason for crediting the statements of an informant." *Armour v. Salisbury*, 492 F.2d 1032, 1035 (6th Cir. 1974) (emphasis added). Accordingly, the fact that the informant was known to the affiant and issuing magistrate and admitted a crime does not alone provide probable cause. In addition to providing scant information about the informant's reliability, the "corroboration" included in Carneal's affidavit does little to reinforce the informant's assertions. The affidavit states that the other passengers in the car confirmed the informant's statement, but it does not say whether they did so unprompted or if the police asked them whether the drugs had come from Higgins's apartment. The affidavit states that the police corroborated the fact that Higgins lived at the stated location, owned the motorcycle parked outside, and had a drug-related criminal history, but none of these facts supports the informant's assertion that he had purchased drugs from Higgins at this location the previous day.

The second difference between this case and *Allen* is that this affidavit does not assert that the informant had been inside Higgins's apartment, that he had ever seen drugs or other evidence inside Higgins's apartment, or that he had seen any evidence of a crime other than the one that occurred when Higgins allegedly sold him drugs. Without such an assertion, the affidavit fails to establish the necessary "nexus between the place to be searched and the evidence sought." *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998) (internal quotation marks omitted), *cert. denied*, 526 U.S. 1077 (1999).

Applying the totality-of-the-circumstances test, we hold that this warrant was not supported by probable cause. The informant gave his statements after the police discovered a large amount of drugs in his car, giving him an incentive to cooperate with the police to help himself. The affidavit contains no assertion that this informant is known to be reliable, nor did the police corroborate any of the informant's statements beyond the innocent fact that Higgins lived at the stated location and the irrelevant (to

the determination of whether Higgins's house contained evidence of a present-day crime) fact that Higgins had a criminal record.  Nor does the affidavit contain any assertion that the informant had been inside Higgins's apartment or that the informant had seen drugs or other evidence in or around Higgins's apartment.  Given these weaknesses, we conclude that the district court erred in its conclusion that this warrant was supported by probable cause.

### b.  Exceptions to Exclusion

In light of two judges on this panel having concluded that the warrant was not supported by probable cause, we must next determine whether an exception to the exclusionary rule applies.  "In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court created a good-faith exception to the usual rule that courts should exclude evidence obtained in violation of the Fourth Amendment" which this court has described as follows:

> *United States v. Leon* modified the exclusionary rule so as not to bar from admission evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective.  Where an officer's reliance on a warrant is objectively reasonable, the Supreme Court held, no additional deterrent effect will be achieved through the exclusion from evidence of the fruits of that search.  However, the good-faith exception is inapposite in four situations:  (1) where the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing magistrate wholly abandoned his judicial role and failed to act in a neutral and detached fashion, serving merely as a rubber stamp for the police; (3) where the affidavit was nothing more than a "bare bones" affidavit that did not provide the magistrate with a substantial basis for determining the existence of probable cause, or where the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the officer's reliance on the warrant was not in good faith or objectively reasonable, such as where the warrant is facially deficient.

*United States v. Rice*, 478 F.3d 704, 711-12 (6th Cir. 2007) (internal quotation marks and citations omitted); *see also Herring v. United States*, 129 S. Ct. 695 (2009).

Although a majority holds in Part II.A.2.a that this warrant was not supported by probable cause, a separate majority holds that the *Leon* good-faith exception applies and makes exclusion an inappropriate remedy in this case. Neither party discusses the issue, but there is no evidence that any circumstances are present that would negate the good-faith exception. There is no evidence that Carneal included false information in the affidavit; there is no evidence that the magistrate acted as a partisan rubber stamp; the affidavit is weak, but it is not bare bones, and this court's precedents are not so clear as to make it "entirely unreasonable" to find probable cause based on such an affidavit; and there has been no showing that the warrant was so obviously deficient that official reliance on it was objectively unreasonable.

"[O]ur good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23. The conclusion that the officers' reliance on the warrant was objectively reasonable requires "'a less demanding showing than the "substantial basis" threshold required to prove the existence of probable cause.'" *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004) (en banc) (quoting *United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002)). In this case, the police had received information from a named informant who, in the course of admitting that he had committed a crime, told police that he had purchased drugs from Higgins's address earlier that day. As discussed above, the police had not worked with the informant before and did not know whether drugs had been sold or seen inside Higgins's residence, but a magistrate did issue a warrant based on the facts included in the affidavit. This circuit's holdings indicate that a nexus between the place to be searched and the item to be seized may sometimes be inferred. *See United States v. Williams*, 544 F.3d 683 (6th Cir. 2008). Here the warrant contained a sufficient link between Higgins's home and drug activity such that a reasonably well-trained officer would not have known that the search was illegal. *See Carpenter*, 360 F.3d at 596. Accordingly, we conclude that exclusion is inappropriate and the evidence stemming from the search should not be suppressed.

**B.  *Apprendi* Claim**

At sentencing and on appeal Higgins argued that because the jury found that his crime involved cocaine base but did not find that it involved crack cocaine, the district court committed error under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), when it imposed an enhanced penalty under 21 U.S.C. § 841(b)(1)(A)(iii).   Section 841(b)(1)(A)(iii) sets the penalty for a crime involving 50 grams or more of a mixture that contains cocaine base.  The verdict form indicates that the jury convicted Higgins of a crime involving 531.8 grams of cocaine base.  At sentencing, the district court noted that because Higgins was convicted of a crime involving more than 50 grams of cocaine base and because Higgins had two or more prior felony drug-related convictions, § 841(b)(1)(A) required the district court to impose a sentence of life imprisonment. Though a surface reading of the statute and the verdict form seems to indicate that the jury found exactly what § 841(b)(1)(A)(iii) requires, Higgins's *Apprendi* claim arises from the fact that term "cocaine base" as used in §841 is ambiguous.  Higgins argues that Congress intended to impose the enhanced penalties reserved for cocaine base only when crack cocaine, a specific form of cocaine base, was involved.  Therefore, Higgins asserts that the jury would have had to find him guilty of a crime involving crack cocaine before those harsh penalties could apply.  *See United States v. Hollis*, 490 F.3d 1149, 1155 (9th Cir. 2007) (confronting same argument).  We agree with Higgins, but conclude that his sentence was proper because it was based on a jury finding that he possessed crack cocaine.

**1.  Statutory Ambiguity**

Congress created the enhanced penalties for crimes involving cocaine base contained in § 841(b)(1)(A) as part of the Anti-Drug Abuse Act of 1986 ("the Act").  *See Kimbrough v. United States*, — U.S. —, 128 S. Ct. 558, 566-67 (2007).  In part, Congress intended this Act to confront the then relatively new and increasing use of the crack form of cocaine.  *Id.*  We have held that "because crack is 'the primary target' of the Act, there could be 'no doubt that[,] whatever else section 841(b)(1)(B)(iii)

encompasses, it certainly includes [crack]."[2] *United States v. Avant*, 907 F.2d 623, 626 (6th Cir. 1990); *see also United States v. Brisbane*, 367 F.3d 910, 912 (D.C. Cir. 2004) ("Whatever Congress meant by 'cocaine base,' there can be no doubt that it meant to include crack.").

The question in the instant case is not whether the term "cocaine base" in § 841 includes crack cocaine. Instead, we must decide whether *Apprendi* "requires the government to charge, and the jury to find, *more than* that defendant distributed cocaine base" before imposing the harsh penalties nominally directed towards "cocaine base" contained in § 841. *Hollis*, 490 F.3d at 1155 (emphasis added). A recent D.C. Circuit case provides useful background:

> Punishment for violating § 841 depends on the weight of drugs involved in the offense. A certain quantity of "cocaine base" will trigger much stiffer penalties than an equivalent quantity of "cocaine, its salts, optical and geometric isomers, and salts of isomers." *Compare* 21 U.S.C. § 841(b)(1)(A)(ii)(II) & (B)(ii)(II) ("subsection (ii)") with 21 U.S.C. § 841(b)(1)(A)(iii) & (B)(iii) ("subsection (iii)"). The problem is that, chemically, "cocaine" and "cocaine base" mean the same thing.
>
> Cocaine is a naturally occurring alkaloid—that is, a base—found in the leaves of the coca plant. The leaves typically undergo extensive processing before reaching the United States. Processors shred the leaves and mash them with a strong alkali (like lime), a solvent (like kerosene), and sulfuric acid. The result is a light brown paste containing cocaine base (cocaine in its natural alkaloid form) and a number of other chemicals. The cocaine paste is processed with hydrochloric acid to create a salt, cocaine hydrochloride, a white or off-white powder. It is usually this powder that is shipped to the United States, where it is known colloquially as "cocaine."
>
> Users generally consume powdered cocaine by snorting it. Since cocaine hydrochloride is water soluble, the nasal mucous membranes absorb the chemical, allowing it to enter the blood stream and eventually reach the brain. Users can also apply the powder to other mucous membranes, or dissolve it in water and inject it intravenously. But they cannot smoke it. The temperature at which cocaine hydrochloride evaporates is higher than the temperature at which its active ingredient breaks down.

---

[2]Although this quotation deals with § 841(b)(1)(B)(iii), there is no difference between this section and the one at issue here, § 841(b)(1)(A)(iii), except that (B)(iii) applies to individuals convicted of crimes involving smaller quantities of drugs.

Cocaine base, on the other hand, can be smoked. The ability to smoke the drug is important because smoking produces a quicker, shorter, and more intense high than snorting. This makes it much more addictive. Smoking cocaine paste, which contains cocaine base, is common in the Andes but rare in the United States because cocaine is generally imported in its powdered, nonsmokable form.

Beginning in the early 1970s, American drug dealers developed several methods to free cocaine base from cocaine hydrochloride so that it could be smoked. The most common method used to produce this "freebase" cocaine involved flammable substances and could result in dangerous explosions. This danger, along with the high price of cocaine, limited freebase's popularity.

In the mid-1980s, a new form of smokable cocaine became widely available. Known by the street name "rock" or "crack," this form was much easier to manufacture than other forms of freebase because the process did not involve volatile chemicals. Also, unlike the "traditional" method of making freebase, the "baking soda method" used to make crack did not remove impurities and adulterants present in the powder. These characteristics combined to produce a highly addictive form of smokable cocaine that was far cheaper than either powder or freebase had ever been. While cost had previously limited cocaine use to people of means, crack made it available to large numbers of young and low-income users.

Crack spread rapidly through several large cities. In 1986, Congress passed the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207, without such normal deliberative processes as committee hearings and reports. Among other measures, the statute purported to impose much higher sentences for crack than for powdered cocaine.

The statute established the quantities of "cocaine, its salts . . ." that would trigger various penalty tiers. But rather than describing crack by street name or manufacturing process, the statute established lower thresholds for any "mixture containing cocaine base." Because "cocaine" and "cocaine base" carry the same chemical meaning (the word "base" merely refers to the fact that cocaine is a base), the statute appears ambiguous, providing two different sets of penalties for the same offense. If the ambiguity remains unresolved, the rule of lenity would suggest imposition of the lower sentence.

*Brisbane*, 367 F.3d at 911-12 (footnote and citations omitted); *see also Hollis*, 490 F.3d at 1156 ("[C]ocaine and cocaine base are chemically identical. If any form of cocaine base qualifies for the enhanced penalties under the statute, then subsection (iii) swallows subsection (ii).").

The situation is further complicated by the meaning of the term "cocaine base" as used in the Sentencing Guidelines. The Anti-Drug Abuse Act of 1986 "adopted a '100-to-1 ratio,'" which the Supreme Court has described as a penalty scheme "that treated every gram of crack cocaine as the equivalent of 100 grams of powder cocaine" and which resulted in significantly higher penalties for individuals convicted of crimes involving crack than powder cocaine. *Kimbrough*, 128 S. Ct. at 567. When the Sentencing Commission developed the Guidelines, it adopted this weight-based ratio and prescribed higher sentences for cocaine base than for cocaine. *Id.* at 567-68; *see also* U.S.S.G. § 2D1.1(c). In 1993, the Commission resolved the ambiguity inherent in punishing these chemically identical substances differently by promulgating an amendment that stated that "'Cocaine base,' for the purposes of this guideline, means 'crack.' 'Crack' is the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form." U.S.S.G. § 2D1.1 (Notes to Drug Quantity Table)(D); *see also United States v. Munoz-Realpe*, 21 F.3d 375, 376-77 (11th Cir. 1994). Congress took no action to bar or change this amendment, the amendment makes no mention of § 841, and Congress did not act to amend § 841.

Higgins's *Apprendi* claim hinges on the ambiguity remaining in § 841. Higgins argues that § 841(b)(1)(A)(ii) and (iii) punish chemically identical substances differently by offering the same mandatory minimums for crimes involving 50 grams of cocaine base as for those involving 5 kilograms of cocaine. Higgins urges us to resolve the ambiguity and give effect to Congress's intent to punish only "crack cocaine" more harshly by applying the penalties that the statute reserves for "cocaine base" exclusively when the jury finds that the cocaine base involved is crack cocaine. Higgins then argues that because the jury did not find that the drug involved in his case was "crack cocaine," the district court violated *Apprendi* when it exposed him to a higher penalty based on a judicial finding that the drug involved was crack cocaine.

There is a circuit split as to how this ambiguity should be resolved. Six circuits have refused to limit the definition of "cocaine base" and have held that "cocaine base"

in § 841 includes all forms of cocaine base.  The First Circuit noted the circuit split and held as follows:  "In this circuit, . . . it is settled that 21 U.S.C. § 841 regulates exactly what its terms suggest:  the possession of any form of 'cocaine base.'  Crack is a form of cocaine base and so is among the substances regulated by the statute, but the government is not required to prove that the substance involved in a given case is crack in order to secure a conviction under it."  *United States v. Medina*, 427 F.3d 88, 92 (1st Cir. 2005) (citations omitted).  Before the Guidelines were amended, the Second Circuit "decline[d] to equate cocaine base with 'crack' cocaine" for purposes of the Guidelines and of § 841 because, although it was clear that Congress meant to include "crack cocaine" when it said "cocaine base," Congress had chosen not to limit the definition of "cocaine base."  *United States v. Jackson*, 968 F.2d 158, 162 (2d Cir. 1992).  After the Guidelines amendment, the Second Circuit seemingly reaffirmed its refusal to limit the definition of cocaine base.  *United States v. Fields*, 113 F.3d 313, 325 (2d Cir. 1997).  The Third Circuit adopted the Second Circuit's approach, rejected the argument that the Guidelines amendment should influence its decision, and concluded that "'cocaine base' encompasses all forms of cocaine base with the same chemical formula when the mandatory minimum sentences under 21 U.S.C. § 841(b)(1) are implicated."  *United States v. Barbosa*, 271 F.3d 438, 466-67 (3d Cir. 2001).  The Fourth Circuit also followed the Second Circuit and concluded that Congress did not intend to limit the term "cocaine base" beyond its known chemical meaning.  *United States v. Ramos*, 462 F.3d 329, 333-34 (4th Cir. 2006).  The Fifth Circuit concluded that "[a]lthough a substance does not appear to be crack cocaine, it may nevertheless be cocaine base within the meaning of § 841(b)."  *United States v. Butler*, 988 F.2d 537, 543 (5th Cir. 1993).  Finally, the Tenth Circuit held that "'cocaine base' is sufficiently defined and distinguishable from other forms of cocaine to prevent arbitrary and discriminatory enforcement."  *United States v. Easter*, 981 F.2d 1549, 1558 (10th Cir. 1992).

Five other circuits[3] have limited the definition of "cocaine base" in § 841.  In contrast with the Second Circuit, the Eleventh Circuit held that by failing to block the

---

[3]We, along with the Eighth Circuit, are the only circuits that have yet to address this issue.

amended Guidelines definition of "cocaine base," "Congress indicated that it intends the term 'cocaine base' to include only crack cocaine." *Munoz-Realpe*, 21 F.3d at 377. After reviewing the circuit split, the Seventh Circuit concluded that "for purposes of the mandatory minimum sentence in 21 U.S.C. § 841(b)(1)(A)(iii), the phrase 'cocaine base' refers to cocaine base that constitutes crack." *United States v. Edwards*, 397 F.3d 570, 577 (7th Cir. 2005). The Ninth Circuit similarly read § 841 "as requiring the indictment to charge and the jury to find 'crack' to trigger the enhanced penalties associated with cocaine base." *Hollis*, 490 F.3d at 1156. The D.C. Circuit "reject[ed] the 'literal' approach" of refusing to limit the definition of "cocaine base." *Brisbane*, 367 F.3d at 913. The *Brisbane* court concluded that it could resolve the ambiguity in § 841 by defining "cocaine base" as "crack cocaine" or by defining "cocaine base" as "any cocaine that is smokable," but declined to adopt either approach because such a holding was not necessary to the resolution of the case before it. *Id.* at 914.

We have examined this precedent, and we agree with those courts that have held that § 841 is ambiguous and that the phrase "cocaine base" in § 841 means "crack cocaine." We also note that the Guidelines have defined "cocaine base" as "crack cocaine," and that our holding will create consistency between the Guidelines and the statute. As currently written, § 841 punishes the possession of chemically identical substances, cocaine and cocaine base, differently. However, it is clear that Congress intended that the enhanced penalties for "cocaine base" would apply to crimes involving "crack cocaine." *Kimbrough*, 128 S. Ct. at 566-67; *Avant*, 907 F.2d at 626. We resolve the ambiguity and give effect to Congress's intent by holding that the term "cocaine base" as used in § 841 means "crack cocaine." Accordingly, under *Apprendi*, before the enhanced penalties of § 841 can apply, the indictment must charge and the jury must find beyond a reasonable doubt that the defendant committed a crime involving crack cocaine.

**2. Higgins's Case**

Having held that the enhanced penalties of § 841 require that the jury find that the defendant committed a crime involving crack cocaine, we must consider whether Higgins's sentence violates *Apprendi.* "This court reviews a constitutional challenge to a defendant's sentence *de novo* wherever the defendant preserves the claim for appellate review." *United States v. Copeland*, 321 F.3d 582, 601 (6th Cir. 2003). Higgins preserved his *Apprendi* challenge by making this argument at his sentencing hearing. If the jury's verdict includes nothing more than a finding that Higgins possessed cocaine base, today's holding would require us to vacate Higgins's sentence.

According to the verdict form, the jury found Higgins guilty of count 1 and also found that in connection with count 1, Higgins possessed 531.8 grams of "cocaine base." J.A. at 71 (Jury Verdict Form at 1). Although the verdict form does not contain the term "crack cocaine," its references to count 1 incorporate the definition of "cocaine base" as "crack cocaine." Both questions that the jury was required to answer explicitly refer to count 1. The indictment describes count 1 as follows: "On or about September 10, 2005, in the Western District of Tennessee, the defendant, Oliver Higgins, did unlawfully, knowingly and intentionally possess with the intent to distribute approximately *531.8 grams of cocaine base (crack cocaine)*. . . ." J.A. at 17 (Indictment at 1) (emphasis added). Given the fact that the indictment clearly defines "cocaine base" as "crack cocaine"[4] and that the verdict form references the indictment, we conclude that the jury found beyond a reasonable doubt that Higgins possessed crack cocaine. Accordingly, the district court did not commit *Apprendi* error when it sentenced Higgins based on the enhanced penalties contained in § 841.

---

[4]In addition to the indictment, the district court also defined "cocaine base" as "crack cocaine." When the district court charged the jury, it stated that "Count 1 charges the defendant, Oliver Higgins, on or about September 10, 2005 unlawfully, knowingly and intentionally possessed with intent to distribute approximately *531.8 grams of cocaine base, or crack cocaine*." J.A. at 175 (Trial Tr. at 239) (emphasis added).

## C. Reasonableness of Sentence

Higgins next argues that his sentence was unreasonable because it is greater than necessary to achieve the goals of sentencing and because the district court failed to consider mitigating factors, namely that Higgins's age made him unlikely to become a recidivist and the disparity between sentencing for crack and powder cocaine.[5] Reasonableness review has two components, procedural and substantive reasonableness, and was described by the Supreme Court in *Gall v. United States*, — U.S. —, 128 S. Ct. 586, 597 (2007):

> Regardless of whether the sentence imposed is inside or outside the Guidelines range, the appellate court must review the sentence under an abuse-of-discretion standard. It must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range. Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard. When conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range. If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness. But if the sentence is outside the Guidelines range, the court may not apply a presumption of unreasonableness. It may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance. The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court.

---

[5]Even though Higgins failed to object to the district court's sentencing procedure after the court imposed sentence, Higgins's sentencing-reasonableness claims are not limited to plain-error review in light of *United States v. Vonner*, 516 F.3d 382, 385-86 (6th Cir. 2008) (en banc). Higgins's procedural-unreasonableness claims are not subject to plain-error review because the district court failed to ask Higgins if he had any additional objections to the sentence after the district court had imposed sentence, as required by *Vonner*. *Id.* Additionally, as to Higgins's claim that his sentence was longer than necessary to comply with 18 U.S.C. § 3553(a),"[a] litigant has no duty to object to the 'reasonableness' of the length of a sentence (or to the presumption of reasonableness) *during* a sentencing hearing." *Id.* at 389.

### 1. Procedural Reasonableness

To conclude that Higgins's sentence was procedurally reasonable, this panel must find that the district court "(1) properly calculated the applicable advisory Guidelines range; (2) considered the other § 3553(a) factors as well as the parties' arguments for a sentence outside the Guidelines range; and (3) adequately articulated its reasoning for imposing the particular sentence chosen, including any rejection of the parties' arguments for an outside-Guidelines sentence and any decision to deviate from the advisory Guidelines range." *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007). Higgins argues that the district court's sentence was not procedurally reasonable because the district court failed to consider Higgins's age and the sentencing disparity between crack and powder cocaine as mitigating factors.

Even assuming that the district court abused its discretion in sentencing Higgins, remand is inappropriate. Higgins was sentenced pursuant to a statutory mandatory minimum such that on remand, "the district court would not have the discretion to impose a shorter term of imprisonment." *United States v. Smith*, 419 F.3d 521, 532 (6th Cir. 2005), *cert. denied*, 546 U.S. 1096 (2006); *see also United States v. Paige*, 470 F.3d 603, 612 (6th Cir. 2006) ("[R]emand is not required by *Booker* when the defendant has been sentenced to a statutory mandatory minimum sentence."). In Higgins's case, even if the district court changed Higgins's sentences on the counts that did not carry a statutory mandatory minimum, these sentences would still run concurrent with the term of life imprisonment mandated by Higgins's conviction on count 1. Accordingly, even assuming that Higgins's sentence is not procedurally reasonable, remand is not the proper remedy, and Higgins's sentence must stand.

### 2. Substantive Reasonableness

We next address whether Higgins's sentence is substantively reasonable. *Bolds*, 511 F.3d at 581. We have held that within-Guidelines sentences are presumed reasonable. *Vonner*, 516 F.3d at 389-90. Although this presumption is rebuttable, we cannot reverse a sentence simply because we determine that a different sentence would

be appropriate.  *Id.*; *see also Gall*, 128 S. Ct. at 597.  The PSR stated that based on Higgins's total offense level of 37 and his criminal history category of VI, his guidelines range was 360 months to life imprisonment plus a consecutive term of five years. Higgins was sentenced to the statutory mandatory minimum of life imprisonment, and this sentence falls within the guidelines range and is presumed reasonable.  Additionally, even were we to conclude that Higgins's sentence is substantively unreasonable, the statutory mandatory minimum would continue to bind the district court, and remand would not be appropriate.  Accordingly, we decline to vacate Higgins's sentence.

## D.  Use of Prior Convictions

Higgins's final argument is that the district court improperly based his sentence on a judicial finding that his prior convictions constituted felony drug offenses.  Higgins objected on the same basis at sentencing.  Higgins faced a mandatory-minimum penalty of life imprisonment because he was convicted of violating § 841(b)(1)(A)(iii) and had more than two prior convictions for a felony drug offense.  Higgins argues that his sentence should be vacated because the Supreme Court is likely to overrule *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), and because the district court did not find convictions in his case, but rather found a fact about those convictions.  Higgins relies heavily on *Shepard v. United States*, 544 U.S. 13 (2005), for both arguments.

Whatever *Shepard* implies about the longevity of *Almendarez-Torres*, it does not overrule the Supreme Court's conclusion that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Apprendi*, 530 U.S. at 490.  Instead, *Shepard* limited the material that a sentencing court can consider when determining the nature of a prior conviction.  The *Shepard* Court held that "a later court determining the character of an admitted burglary is generally limited to examining the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented."  *Shepard*, 544 U.S. at 16.

Higgins's enhanced sentence required a finding that he had been convicted of at least two prior felony drug offenses. § 841(b)(1)(A). Congress has defined "felony drug offense" as follows: "The term 'felony drug offense' means an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances." 21 U.S.C. § 802(44). The PSR lists at least six offenses of which Higgins was convicted which restrict drug-related conduct and which resulted in a sentence of more than one year. Higgins does not challenge the fact that he was convicted of these offenses, the facts underlying the convictions, or the length of sentence that was imposed. Because the district court could determine that these convictions were felony drug offenses for the purposes of § 841 based solely on the statutory definitions of the crimes, the district court did not err when it used these convictions to enhance Higgins's sentence. Accordingly, we **AFFIRM** the district court's decision to enhance Higgins's sentence based on prior convictions.

## III.  CONCLUSION

For the reasons discussed above, we **AFFIRM** Higgins's conviction and sentence.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

CLAY, Circuit Judge, concurring in part and dissenting in part.  I concur in Part II.A.2.a of the lead opinion holding that the affidavit submitted by Officer William Carneal did not establish probable cause to search Higgins' apartment.  However, I disagree that the good faith exception articulated in *United States v. Leon*, 468 U.S. 897 (1984), prevents suppression of the evidence, and I dissent from Part II.A.2.b of the lead opinion which finds that official reliance on the warrant was not objectively unreasonable.

Thus, contrary to the lead opinion's conclusion that a "majority holds that the *Leon* good-faith exception applies," Op. at 12, the lead opinion is alone in finding that *Leon* prevents exclusion of the evidence.  While Judge Kethledge joins Part II.A.2.b of the lead opinion, he resolves Higgins' challenge to the denial of the motion to suppress by concluding that the search warrant was supported by probable cause.  Accordingly, since Judge Kethledge determines that the magistrate properly found probable cause, it would seem that he is not entitled to reach the issue of whether the *Leon* exception applies—except perhaps as a matter of *dicta*.  In other words, it is my view that only one vote, that of Judge Moore, actually supports the applicability of the *Leon* exception. Nevertheless, even in the absence of a majority in support of Part II.A.2.b, I understand that the disposition of the case results in a two-judge majority affirming the denial of Higgins' motion to suppress.  Consequently, for the reasons that follow, I dissent from the majority's holding.

When police seize evidence during the course of an unconstitutional search, as in this case, a trial court generally must exclude the evidence.  *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005).  However, "[t]he exclusionary rule does 'not bar the government's introduction of evidence obtained by police officers acting in objectively reasonable reliance on a search warrant that is subsequently invalidated.'" *United States v. McPhearson*, 469 F.3d 518, 525 (6th Cir. 2006) (quoting *United States v. Laughton*,

409 F.3d 744, 748 (6th Cir. 2005)).  In determining whether police acted in good faith, the "inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."  *Leon*, 468 U.S. at 922 n.23.

Although the Supreme Court in *Leon* concluded that suppression of evidence is not always an appropriate remedy for unconstitutional searches, the Supreme Court also established four circumstances under which an officer's reliance on the issued warrant cannot be reasonable and where suppression thus remains appropriate:

> (1) where the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing magistrate wholly abandoned his judicial role and failed to act in a neutral and detached fashion, serving merely as a rubber stamp for the police; (3) where the affidavit was nothing more than a "bare bones" affidavit that did not provide the magistrate with a substantial basis for determining the existence of probable cause, or where the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the officer's reliance on the warrant was not in good faith or objectively reasonable, such as where the warrant is facially deficient.

*United States v. Hython*, 443 F.3d 480, 484 (6th Cir. 2006).  While there is no evidence that Officer Carneal included false information in the affidavit or that the magistrate failed "to act in a neutral and detached fashion," *id.*, the officer's reliance on the warrant to support the search of Higgins' apartment was not "objectively reasonable." Therefore, Officer Carneal cannot "assert reasonable reliance, nor [a] court[] find good faith." *United States v. Hodson*, 543 F.3d 286, 292 (6th Cir. 2008).

As the lead opinion recognizes, the affidavit submitted by Officer Carneal did not set forth a "substantial basis" for the magistrate to find probable cause that evidence of drug-trafficking would be found in Higgins' apartment.  Nonetheless, the lead opinion upholds the admission of the evidence on the basis of the *Leon* exception, finding that "the warrant contained a sufficient link between Higgins's home and drug activity such

that a reasonably well trained officer would not have known that the search was illegal." Op. at 12.  I disagree.

For the same reasons that the warrant was not supported by probable cause, "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization," *Leon*, 468 U.S. at 922 n.23, inasmuch as a reasonably well trained officer could not have believed that the affidavit provided a basis for establishing probable cause.  A tip from a just-arrested "informant," whose reliability and veracity are unknown to the officer and the magistrate, that Higgins had sold drugs at a particular address would not lead a reasonable officer to conclude that probable cause existed to search Higgins' apartment.  *See McPhearson*, 469 F.3d at 526;  *cf. United States v. Helton*, 314 F.3d 812, 821-22 (6th Cir. 2003) (concluding that an unreliable informant's tips "do not merit much weight in the probable cause determination").  Further, the affidavit contained no corroboration of the *criminal* details of Higgins' alleged activities, and contained no indication that a search would uncover drugs *inside* of Higgins' apartment.  The affidavit did not state that the affiant observed drugs or drug transactions inside Higgins' apartment, nor did the affidavit attest to the informant's reliability.  A reasonably well trained officer would understand that further corroboration—such as independent surveillance or further questioning of the informant to determine whether he had seen drugs inside of Higgins' apartment—was needed before probable cause could be established to search the apartment.  *See United States v. Leake*, 998 F.2d 1359, 1367 (6th Cir. 1993) (concluding that an officer "could not properly have placed objective good faith reliance on the  warrant" because a reasonably well trained police officer would have known that additional corroboration of an informant's tip was needed to establish probable cause).

For these reasons, I dissent from the lead opinion's conclusion that *Leon*'s good faith exception applies.  Because I would reverse the district court's denial of Higgins' motion to suppress and remand the case to the district court for further proceedings, I would not reach the sentencing issues that Higgins raises on appeal.

---

**CONCURRENCE**

---

KETHLEDGE, Circuit Judge, concurring.  I concur in Judge Moore's opinion in all respects but one: I would hold that sufficient evidence supported the district court's finding of probable cause.

Here, the district court considered five pieces of evidence that, when taken "in the light most likely to support [its denial of the motion to suppress]," *United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008), support that finding.  First, the court knew the informant's identity.  Second, the police found 41 grams of cocaine in the informant's car.  Third, the informant said he picked up the cocaine earlier that day from a specific address, which the police verified to be Higgins' residence.  Fourth, two passengers—when separated and interviewed independently—said the informant had driven them to Higgins' residence that day.  And fifth, the informant identified Higgins as the seller, and disclosed that he had purchased narcotics from Higgins at that residence on another occasion as well.

This evidence brings the case within the purview of *United States v. Allen*, 211 F.3d 970, 976 (6th Cir. 2000).  The informant was reliable; he was a "known person"; two independent sources corroborated his statements regarding his whereabouts that day; and the informant admitted to his own prior criminal conduct.  There was also a factual foundation for the informant's claim of witnessing a recent crime:  Namely, he was caught red-handed with cocaine, which by his own account he had just purchased from Higgins. Consequently, "a neutral and detached magistrate [could] believe that evidence of a crime [would] be found" at Higgins' residence, *id.*, and the district court properly denied his motion to suppress.

My disagreement with Judge Moore ultimately does not matter much, since the issue does not affect our disposition of the case.  She holds, and I join her in holding, that the *Leon* good-faith exception applies here.

For these reasons, I join all but section II.A.2.a of Judge Moore's opinion.