RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0084p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 18-1083

RONALD LEWIS COLEMAN, JR.,

*Defendant-Appellant*.

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:17-cr-00136-1—Paul Lewis Maloney, District Judge.

Argued: January 17, 2019

Decided and Filed: May 3, 2019

Before: BOGGS, KETHLEDGE, and NALBANDIAN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Clare E. Freeman, THE FEDERAL DEFENSE GROUP, P.L.L.C., La Porte, Texas, for Appellant. Sally J. Berens, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Clare E. Freeman, THE FEDERAL DEFENSE GROUP, P.L.L.C., La Porte, Texas, for Appellant. Davin M. Reust, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

───────────────

## OPINION

───────────────

BOGGS, Circuit Judge. Defendant Ronald Coleman appeals the district court's denial of a motion to suppress the fruits of a warrant for vehicle tracking and a residential search warrant

on the grounds that the warrants lacked probable cause and that law enforcement's installation of the vehicle tracker violated the Fourth Amendment. Because the warrants were amply supported by probable cause and the officer did not violate the Fourth Amendment when installing the tracker, we affirm.

I

On March 9, 2017, law-enforcement agents began investigating Eddie Powell, a drug dealer, and his sources of narcotics. A cooperating defendant[1] identified one of those sources as the defendant, Ronald Coleman. Officers began investigating Coleman and observed his two automobiles, a brown Trailblazer and a white Buick Enclave, in connection with suspected drug sales to Powell. Specifically, on April 7, 2017, law-enforcement officers observed an individual matching Coleman's description arrive at Powell's house, get out of Coleman's Enclave, enter the house, and leave three minutes later. Then, four days later, Coleman arrived at Powell's house in the Trailblazer and sold cocaine to the cooperating defendant.

Around this time, a law-enforcement agent checked Coleman's criminal history and determined he had felony convictions in 2006 and 2009 for delivery or manufacture of a controlled substance. The agent also discovered that both vehicles were registered to Coleman's father and observed that, in his experience, drug traffickers frequently register their vehicles in the names of family or friends to conceal their identities. The agent detailed all of these findings, as well as the facts from the suspected drug sales, in a supporting affidavit and, on April 19, 2017, obtained tracking warrants from a federal magistrate judge for Coleman's Enclave and Trailblazer on the belief that tracking those vehicles would provide evidence of their involvement in the distribution of narcotics.[2]

On April 20, 2017, an ATF agent attached the tracking devices to Coleman's Enclave and Trailblazer. To apply the trackers, the agent went to Coleman's condominium on East Springtree

---

[1]The cooperating defendant was a reliable informant and conducted multiple controlled buys associated with this case.

[2]While the agent obtained vehicle-tracking warrants for both the Enclave and the Trailblazer, Coleman is challenging only the warrant for the Enclave.

Lane SW in Grand Rapids, which is part of the Silverleaf Condominium Complex, a collection of approximately 40 residential units scattered across several streets within the complex.

There is no gate or fence at the entrance to the Silverleaf complex, but there is a small sign that says: "PRIVATE PROPERTY." The sign, however, does not forbid outside visitors and anyone can drive onto the streets of the condominium complex unimpeded. Residents are able to have visitors without requesting permission from neighbors, the Postal Service delivers mail to mailboxes inside the complex, and there is a single trash-collection business that serves all units.

Coleman's condominium unit is roughly a mile down the road from the entrance of the complex, alongside other similar buildings. His particular unit is in a building shared by three other families, and his driveway is shared with a neighboring family. The entire driveway consists of a single concrete slab leading to Coleman's garage and the garage of Coleman's neighbor. No gate, fence, or hedgerow surrounds the condo, and it is common for residents to walk by each other's vehicles over the course of a day.

To attach the tracking devices, the agent parked in a public parking spot across the street from Coleman's condo and walked up to Coleman's Enclave, which was parked in front of his garage a few feet onto the driveway. Coleman's Trailblazer was across the street, in a parking spot shared by residents and guests.

On May 4 and May 10, 2017, Coleman sold cocaine to Powell. During the May 10 sale, agents observed Coleman leave his condo, enter the Enclave, and get out of the Enclave at Powell's home. Agents also watched the GPS tracking data from the Enclave vehicle tracker, and the data appeared to show that Coleman traveled directly from his condo to Powell's house. Based on this information, agents applied for a warrant to search Coleman's condo for evidence of drug trafficking and money laundering. On May 23, 2017, a different federal magistrate judge than the one who had signed the tracking warrants signed the condo search warrant.

On May 31, 2017, agents executed the condo warrant, seizing approximately 500 grams of cocaine, a firearm, and documents and property indicative of money laundering. Agents then interviewed Coleman and he admitted possession and ownership of the cocaine and a firearm.

No. 18-1083 *United States v. Coleman* Page 4

Later that day, the government filed a complaint against Coleman and, on June 27, 2017, he was indicted on three counts of a five-count indictment, charging him with conspiracy to distribute cocaine, possession with intent to deliver cocaine, and being a felon in possession of a firearm.

On July 25, 2017, Coleman moved to suppress the fruits of the vehicle-tracking and residential search warrants, arguing that the warrants contained insufficient probable cause and that the agents attached the tracking device on Coleman's Enclave in violation of the Fourth Amendment. After receiving the evidence and arguments, the district court held that (1) the Enclave warrant was supported by probable cause; (2) Coleman's driveway was not within the curtilage of his home; (3) the residential search warrant was supported by probable cause; and (4) even if the warrants were not supported by probable cause, ATF agents executed them in good faith.

On September 12, 2017, Coleman pled guilty to the three counts against him by way of a conditional plea agreement. The plea agreement allowed Coleman to appeal the denial of his motion to suppress. On January 22, 2018, the district court sentenced Coleman to 120 months of imprisonment.

II

Coleman first argues that the warrant for installing a tracking device on his Buick Enclave was not supported by probable cause. We disagree.

According to Federal Rule of Criminal Procedure 41(c)–(d), a magistrate judge must issue a tracking-device warrant if a supporting affidavit establishes probable cause to believe that the device will uncover evidence, fruits, or instrumentalities of a crime. Here, the affidavit had established numerous facts supporting the notion that the use of a tracking device on Coleman's Enclave could uncover further evidence of wrongdoing:

- A confidential informant identified Coleman as a current drug supplier to Powell.
- Authorities had been investigating four drug sales at Powell's residence, one of which involved Coleman dropping off cocaine for Powell.
- A law-enforcement agent observed an individual matching Coleman's description drive to Powell's house in the Enclave, stay only four minutes,

and leave, activity that could be consistent with the driver engaging in illegal drug sales.

- Coleman had two prior felony convictions for delivery/manufacture of controlled substances.

- A Law Enforcement Information Network (LEIN) check on the vehicle identified Coleman's father as the Enclave's owner.

Courts have upheld vehicle-tracking warrants based on much weaker factual allegations than these. *See, e.g., United States v. Faulkner*, 826 F.3d 1139, 1145 (8th Cir. 2016) (upholding a vehicle-tracking warrant where a confidential informant told police the defendant brought heroin from Chicago to Minneapolis, stayed at two addresses, and drove two vehicles, but where no one had directly observed either vehicle involved in suspected drug activity); *United States v. McNeal*, 818 F.3d 141, 150 (4th Cir. 2016) (upholding a tracking warrant where affidavit established merely that the vehicle was registered to suspect's mother and driven to case banks, and where an informant tipped authorities the vehicle was used in bank robberies). Accordingly, we hold that the tracking warrant was supported by probable cause.

III

Next, Coleman claims that authorities violated his Fourth Amendment rights when an ATF agent entered his condominium's driveway to install the GPS tracking device on his Enclave. Coleman alleges two Fourth Amendment violations resulting from the agent's actions: the first when the agent entered Coleman's condominium complex despite there being a sign reading "PRIVATE PROPERTY," and the second when the agent walked onto Coleman's driveway to install the GPS tracker.

"When the government gains information by physically intruding into one's home, a search within the original meaning of the Fourth Amendment has undoubtedly occurred." *Morgan v. Fairchild Cty., Ohio*, 903 F.3d 553, 561 (6th Cir. 2018) (internal quotation marks and citations omitted). "But it is not just the physical house that receives the Amendment's protection. The curtilage—the area immediately surrounding and associated with the home—is treated as part of [the] home itself for Fourth Amendment purposes." *Ibid.* (internal quotations marks and citations omitted). "The protection afforded the curtilage is essentially a protection of

families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *Collins v. Virginia*, 138 S. Ct 1663, 1670 (2018). Courts have identified four factors as a guidepost to determining whether an individual has a reasonable expectation of privacy in an area, placing it within the home's curtilage: (1) proximity to the home; (2) whether the area is within an enclosure around the home; (3) uses of the area; and (4) steps taken to protect the area from observation by passersby. *United States v. Dunn*, 480 U.S. 294, 301 (1987). It is a "fact-intensive analysis" conducted on a case-by-case basis. *Morgan*, 903 F.3d at 561. As the proponent of the motion to suppress, Coleman "bears the burden of establishing that the challenged search violated his Fourth Amendment rights." *United States v. Witherspoon*, 467 F. App'x 486, 490 (6th Cir. 2012).

Coleman first argues that the agent's entry onto the condominium complex itself violated his Fourth Amendment rights. We disagree. Though the condominium complex had a "PRIVATE PROPERTY" sign at its entrance, anyone could drive into the complex without express permission. No gate prevented outsiders from entering, and the condo association had not taken any effort to keep non-residents out. The sign itself did not require permission to enter, prohibit outside visitors, or even state "no trespassing." Accordingly, the agent did not violate Coleman's Fourth Amendment rights merely by entering the condominium complex. *See, e.g., United States v. Dillard*, 438 F.3d 675, 682 (6th Cir. 2006) (holding that defendant had no reasonable expectation of privacy in the common area of his building's duplex that was unlocked and open to the public because he "made no effort to maintain his privacy in the common hallway and stairway" and therefore "did nothing to indicate to the officers that they were not welcome in the common areas").

Whether the ATF agent intruded onto the curtilage of Coleman's building by entering his driveway, however, is a closer question. Coleman places heavy emphasis on the Supreme Court's recent decision in *Collins* in arguing that such an intrusion occurred. In *Collins*, police were investigating a motorcycle thought to be stolen by the defendant, Ryan Collins. 138 S. Ct. at 1668. An officer tracked down the vehicle to Collins's girlfriend's residence and walked onto the property to the top of the driveway to examine the vehicle, which was under a tarp. *Ibid*. The officer then pulled off the tarp, ran a search of the license plate and vehicle identification

numbers, and discovered that the motorcycle was stolen. *Ibid.* After gathering this information, the officer took a photograph of the uncovered motorcycle, put the tarp back on, left the property, and returned to his car to wait for Collins to return. *Ibid.* At no point in this process did the officer have a warrant. *Ibid.* The Court described the driveway as follows:

> [T]he driveway runs alongside the front lawn and up a few yards past the front perimeter of the house. The top portion of the driveway that sits behind the front perimeter of the house is enclosed on two sides by a brick wall about the height of a car and on a third side by the house. A side door provides direct access between this partially enclosed section of the driveway and the house. A visitor endeavoring to reach the front door of the house would have to walk partway up the driveway, but would turn off before entering the enclosure and instead proceed up a set of steps leading to the front porch. When [the officer] searched the motorcycle, it was parked inside this partially enclosed top portion of the driveway that abuts the house.

*Id.* at 1670–71. The Court held that, "[j]ust like the front porch, side garden, or area outside the front window, the driveway enclosure where [the officer] searched the motorcycle constitutes an area adjacent to the home and to which the activity of home life extends, and so is properly considered curtilage." *Ibid.* (internal quotations marks and citations omitted). Accordingly, the Court found that the officer had violated Collins's Fourth Amendment rights by intruding onto the building's curtilage.

The facts in *Collins*, however, are quite different from the facts here. In *Collins*, the portion of the driveway where the motorcycle sat was past the front perimeter of the home, enclosed on three sides (two by a brick wall, one by the home itself), and not on the way to the front door of the residence. 138 S. Ct. at 1670–71. Coleman's Enclave, in contrast, was sitting in front of the residence, was not enclosed by anything, and was on the way to the entrance of his home. The *Collins* motorcycle was also covered with a tarp; Coleman's car was not. Finally, the Coleman driveway was in fact shared with other families and other condo residents frequently walked past cars parked in front of condo units. See *United States v. Jones*, 893 F.3d 66, 72 (2d Cir. 2018) ("[*Collins*] . . . has no effect on [defendant's] appeal, which fails because the driveway in which [defendant's] vehicle was parked was the *shared* driveway of tenants in two multi-family buildings and was not within the curtilage of [defendant's] private home.").

Though prior to the *Collins* ruling, the Sixth Circuit cases of *United States v. Galaviz*, 645 F.3d 347 (6th Cir. 2011), and *United States v. Estes*, 343 F. App'x 97 (6th Cir. 2011), survive *Collins* and are factually more on point. Both cases involved driveways with similar characteristics to the one here: adjacent to a home, not enclosed, abutting a sidewalk or alley, with no steps taken to obstruct the view of passersby. *Galaviz*, 645 F.3d at 356; *Estes*, 343 F. App'x at 101. In both instances, this court held that the officers did not intrude upon the building's curtilage by entering the driveway. In *Estes*, we held that "at least three of the factors in *Dunn* undercut a finding that the driveway represents curtilage" because "the area was not closed," "defendant had not taken any steps to protect the area from observation by people passing by," and "it was used as a point of entry into the residence." *Estes*, F. App'x at 101 (internal quotation marks omitted). In *Galaviz,* the court found that, while "the driveway was directly adjacent to the house," it "was not enclosed by a fence or other barrier and was short, with the portion of the driveway where [the defendant's] car was parked directly abutting the public sidewalk" and that "no apparent steps were taken by the residents of the house to protect the driveway from observation by passersby—no hedges or bushes obstructed the view of the driveway from the sidewalk or street, for example." *Galaviz*, 645 F.3d at 356. Those same analyses would apply to the driveway in question here. While the proximity of the driveway to the residence here may lean in favor of considering it to be curtilage, the other *Dunn* factors— whether the area is within an enclosure around the home, the uses of the area, and the steps taken to protect the area from observation by passersby—all point toward the opposite conclusion.

Accordingly, we hold that the ATF agent did not intrude upon the curtilage of Coleman's residence in order to install the vehicle tracker and therefore did not run afoul of the Fourth Amendment.

IV

Finally, Coleman argues that there was insufficient probable cause for the magistrate judge to issue a search warrant for Coleman's condo. "The job of a magistrate judge presented with a search warrant application is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Brown*,

828 F.3d 375, 381 (6th Cir. 2016) (internal quotation marks and citation omitted). There must be a "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). However, a magistrate issuing a search warrant "may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking." *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008). This reflects the reality that, "in the case of drug dealers, evidence is likely to be found where the dealers live." *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998) (citation and alteration omitted).

Here, the affidavit in support of the residential search warrant established that Coleman was an active drug trafficker, that the Springtree Lane address was Coleman's home, and that both of Coleman's vehicles were regularly parked there. According to the affidavit, agents had conducted three controlled buys of cocaine from Coleman and observed him drive directly from his condo to the site of the most recent buy, less than two weeks before the warrant issued. This was sufficient to establish that Coleman was an active drug trafficker at the time the warrant issued and to provide a reasonable inference that he transported narcotics from his residence to the location of the cocaine sale. *See, e.g., United States v. Bucio-Cabrales*, 635 F. App'x 324, 334 (6th Cir. 2016) (evidence defendant traveled to two addresses—one of which was home— prior to narcotics sales supported inference he was storing narcotics at one residence); *United States v. Gunter*, 266 F. App'x 415, 419 (6th Cir. 2008) ("[T]he instant affidavit describes an incident where law enforcement agents observed Defendant visiting his residence right before he traveled to the site of a drug sale. . . . This evidence, combined with the affiant's statements that he has significant experience in narcotics investigations, is sufficient to establish a nexus between Defendant's illegal activities and his residence.").

Coleman points to several cases where this court granted motions to suppress evidence on the basis that the warrants in question lacked probable cause that the defendant stored narcotics at his home. *See Brown*, 828 F.3d at 385; *United States v. Higgins*, 557 F.3d 381, 390 (6th Cir. 2009); *United States v. Helton*, 314 F.3d 812, 823 (6th Cir. 2003). Each of these cases, however, had much weaker facts linking the drugs to the defendant's home, and none of them established the defendant as an *active* drug dealer. In *Higgins*, the supporting affidavit relied on an unproven tipster, with no evidence that the tipster observed narcotics or evidence of illegal drug sales

associated with the defendant's residence. *Higgins*, 557 F.3d at 389–90. Here, however, the informant was reliable, having conducted multiple controlled buys associated with the case, and law-enforcement agents independently established that Coleman delivered cocaine shortly after leaving his house. In *Helton*, the only nexus evidence was an anonymous tip and evidence that the owner of the residence had received calls from suspected drug dealers, a far cry from that which we have here: a proven informant who conducted multiple controlled buys along with evidence that Coleman drove from his home to the location of the drug sale. *Helton*, 314 F.3d at 820–21. And in *Brown*, the court required a "more direct connection" to the residence such as "surveillance indicating that [the defendant] had used the car to transport [drugs] from his home to [the site of a drug transaction]," which is precisely the surveillance evidence that had been gathered here. *See Brown*, 828 F.3d at 383.

We therefore hold that the residential search warrant was amply supported by probable cause.

V

Accordingly, we AFFIRM.