RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0282p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 18-6239

RICHARD R. CRAWFORD,

*Defendant-Appellant*.

───────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 2:17-cr-00034-1—David L. Bunning, District Judge.

Decided and Filed:  November 18, 2019

Before:  BATCHELDER, DONALD, and READLER, Circuit Judges

───────────────

**COUNSEL**

**ON BRIEF:**  Nathan A. Ray, BURDON & MERLITTI, Akron, Ohio, for Appellant.  Charles P. Wisdom, Jr., James T. Chapman, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

───────────────

**OPINION**

───────────────

CHAD A. READLER, Circuit Judge.  Confidential informants play an important role in combatting drug trafficking.  Reflecting as much, our cases reveal numerous examples of confidential informants providing critical information to support search warrants targeting drug crimes.

These same issues were at play in the investigation that resulted in Richard Crawford's drug trafficking conviction. Almost all the evidence used to justify the search warrants that resulted in Crawford's arrest was provided by a confidential informant. Challenging that practice, Crawford contends that the officers who sought the warrants did not verify sufficiently the informant's reliability. Crawford is correct to emphasize the point—informants must be trustworthy and credible. But he is wrong in his conclusion. Here, the informant's reliability was confirmed both by law enforcement agencies and through the affiant officer's own research. Adding in the fact that the key information disclosed by the informant proved to be credible, there were many reasons to deem the informant reliable, thereby justifying the warrants. Accordingly, we **AFFIRM** the judgment below.

## I. FACTS AND PROCEDURAL HISTORY

Officer Erik Nelson of the Blue Ash (Ohio) Police Department learned that Richard Crawford was dealing cocaine. That information, however, was not obtained first-hand. Instead, it came from a confidential informant, Jerry Heard, who was previously unknown to Nelson. To help establish his credibility as an informant, Heard identified Crawford from Crawford's driver's license photograph, and provided Nelson with Crawford's telephone number.

Nelson took additional steps to verify Heard's credibility as an informant. Nelson contacted two law enforcement officers who had experience working with Heard—Sergeant Dave Lewis of the Drug Abuse Reduction Task Force, and Agent Josh Schlie of the Hamilton County (Ohio) Heroin Coalition Task Force. Both officers confirmed Heard's reliability, based upon their past interactions with him as an informant.

With these assurances, Nelson communicated with Heard a second time. After affirming that Crawford's telephone number was unchanged, Heard told Nelson that Crawford had twenty ounces of cocaine he was going to sell. That prompted Nelson to review Crawford's background. Doing so revealed Crawford's prior convictions for drug-trafficking offenses.

Heard continued to gather evidence incriminating to Crawford. Chief among that evidence, Crawford told Heard that Crawford could buy a kilogram of cocaine for $42,000 from a criminal organization in Columbus, and that Crawford would sell Heard an ounce of that

cocaine for $1,500, should the sale with the Columbus organization come to pass.  Heard relayed this information to Nelson.  And he affirmed that Crawford's telephone number was unchanged, this time by showing Nelson text messages between Crawford and Heard.

*The First Search Warrant.*  Relying on this collection of information, Nelson obtained a warrant from an Ohio state court judge to electronically track Crawford's cellphone—the first of three warrants officers would obtain to investigate Crawford.  In his affidavit attached to the first warrant application, Nelson detailed the conversations he had with a confidential informant (Heard) as well as the steps he took to verify the informant's reliability.  But he did not name Heard in the affidavit.

The next day, Heard told Nelson that Crawford drove a silver 2003 BMW X5.  Using that information as well as the license plate number provided by Heard, Nelson learned that the vehicle was registered to Crawford at a residence in Cincinnati, Ohio.  Temporal cellphone data, however, placed Crawford near an apartment in Florence, Kentucky, leased to Crawford's wife.  So Nelson surveilled the apartment.  He saw Crawford walk out of the apartment and drive away in the BMW previously identified by Heard.  Heard later told Nelson that Crawford had again offered to sell him cocaine, this time for $1,400 an ounce.

*The Second Search Warrant.*  Agent Chris Boyd of the Norfolk (Kentucky) Police Department assisted Nelson in investigating Crawford.  Boyd sought a second warrant—one that would allow officers to place a tracking device on Crawford's vehicle.  In his affidavit, Boyd included both the information Nelson received from Heard as well as the information Nelson independently gathered.  Relying on Boyd's affidavit, a Kentucky state court judge issued a warrant authorizing officers to use the GPS device.

A few weeks later, Heard, with the aid of law enforcement, completed a controlled drug-buy from Crawford.  During a phone call monitored by law enforcement, Heard and Crawford agreed to meet at a nearby gym.  Officers surveilling Crawford saw him leave his apartment holding a small black duffle bag.  Heard had previously informed officers that Crawford kept his cocaine inside a similar bag.  After confirming that Heard was not in possession of any controlled substances or U.S. currency, officers provided Heard with $1,400 in cash, the serial

numbers of which had been recorded by the officer. The officers also placed a listening device on Heard. Once Heard was inside the gym, however, the device did not function, meaning the police could not monitor Heard's interaction with Crawford. But Heard filled in the gaps. According to Heard, he followed Crawford's instructions and went to the locker room, where Crawford was storing cocaine in a bag. Heard put the money in that bag, took out the cocaine, and gave the bag back to Crawford. GPS tracking information revealed that Crawford drove back to his apartment following the locker room exchange.

*The Third Search Warrant.* Two days later, Boyd obtained a third search warrant regarding Crawford. This one was for Crawford's apartment. In the supporting affidavit, Boyd included the facts used to obtain the prior warrants as well as the details of the controlled buy. With respect to the latter, the affidavit noted that the call participants "discussed meeting in order for Crawford to sell [Heard] cocaine." The affidavit also set forth the details of the buy itself.

Later that day, officers executed the warrant and searched Crawford's apartment. During the search, officers found cocaine. They also found $3,705 in cash, which included $1,390 in tagged bills used in the controlled buy. Crawford was detained, Mirandized, and interviewed by officers at the scene. Crawford incriminated himself, admitting that he sold on consignment an ounce of cocaine to "Jerry," and that he had placed cocaine under his sink.

*The Criminal Proceedings*. On September 14, 2017, the grand jury returned a three-count indictment in which Crawford was charged as follows:

- Count One: Knowingly and Intentionally Distributing a Mixture or Substance Containing Cocaine, in violation of 21 U.S.C. § 841(a)(1).

- Count Two: Knowingly and Intentionally Possessing a Mixture or Substance Containing Cocaine With Intent to Distribute it, in violation of 21 U.S.C. § 841(a)(1).

- Count Three: Knowingly and Intentionally Possessing 28 Grams or More of a Mixture or Substance Containing Cocaine Base Crack With the Intent to Distribute, in violation of 21 U.S.C. § 841(a)(1).

Crawford filed three motions with the district court—two to suppress evidence, and a third, a variation of the first two, which elaborated on Crawford's argument that each warrant lacked probable cause. Through these motions, Crawford argued that none of the warrants

should have issued. With respect to the warrant authorizing the search of his home, Crawford argued that Boyd, in the affidavit attached to the third warrant application, made a materially false statement regarding the content of the phone conversation during which the gym meeting was arranged.

Crawford also challenged the government's reliance on his inculpatory statements made to officers. Citing *Miranda v. Arizona*, 348 U.S. 436 (1966), Crawford argued that those statements should be suppressed, either because he was not Mirandized, or, if he was, because he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights.

A magistrate judge took up Crawford's arguments. In her report, the magistrate judge recommended that Crawford's suppression motions be denied. The magistrate judge likewise recommended that Crawford should not receive a *Franks* hearing because he did not show that officers recklessly included false statements in the affidavit supporting the third warrant application, nor did he show that excising the challenged statements would change the result of the probable-cause analysis.

Crawford filed objections to the magistrate judge's rulings (save for the ruling that Crawford voluntarily and knowingly waived his *Miranda* rights). Following a hearing, the district court adopted the magistrate judge's Report and Recommendation and denied Crawford's motions.

The case proceeded to trial. Much of the case turned on Nelson's testimony. Nelson testified that he believed Heard to be a reliable informant, explaining how he verified Heard's reliability. Nelson went on to detail the information he received from Heard as well as the actions he took upon receiving that information. At the close of evidence, the jury convicted Crawford of Count One. For Counts Two and Three, the jury found Crawford guilty of the lesser included offense of Possession of Cocaine and Cocaine Base.

The ensuing presentence report initially set Crawford's offense level at 16. But because Crawford was deemed to be a career offender, his offense level was raised to 34. Crawford's criminal history category was set at VI. Applying those sentencing metrics, Crawford's Guidelines range was calculated as 262 to 327 months. At sentencing, the district court varied

downward, imposing an aggregate sentence of 216 months, plus an aggregate term of six years of supervised release.

## II. ANALYSIS

**A.    The Three Search Warrants Underlying The Investigation Of Crawford Were Supported By Probable Cause.**

The district court denied Crawford's motions to suppress evidence obtained after execution of three search warrants, one each for Crawford's phone, car, and home.  According to Crawford, those investigatory efforts constituted "unreasonable searches and seizures" by government officials, in violation of the Fourth Amendment to the United States Constitution.

Generally speaking, a search that occurs pursuant to a warrant validly issued by a judicial officer will insulate law enforcement from a Fourth Amendment challenge.  *See United States v Leon*, 468 U.S. 897, 913–14 (1984).  For a warrant to be validly issued, however, it must have been based on "probable cause" justifying the search.  *United States v. Christian*, 925 F.3d 305, 311 (6th Cir. 2019) (en banc).

Whether the supporting affidavit establishes probable cause is determined by examining the "totality of the circumstances" underlying the search.  *United States v. Hines*, 885 F.3d 919, 923 (6th Cir. 2018) (citations omitted).  Having made that examination, the judicial officer should issue the warrant where those underlying circumstances reflect "a fair probability that contraband or evidence of a crime will be found in a particular place."  *United States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009) (quoting *United States v. Miller*, 314 F.3d 265, 268 (6th Cir. 2002)).  Put another way, the probable-cause standard is satisfied "where the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."  *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005) (internal quotations omitted) (parentheses in original).

Where an executed warrant is later challenged by a defendant, the reviewing court, in assessing whether there was probable cause for the warrant to issue, is limited to examining only "the information presented in the four-corners of the affidavit."  *United States v. Frazier*,

423 F.3d 526, 531 (6th Cir. 2005) (citations omitted); *see also Christian*, 925 F.3d at 314 (Thapar J., concurring).  But as to the conclusions to be drawn from the information within those four corners, a reviewing court must accord "great deference" to the decision of the issuing court.  *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc) (citations and internal quotations omitted).  This deferential approach ensures that "an issuing [court's] discretion [will] only be reversed if it was arbitrarily exercised."  *Id.*  (citing *United States v. Swihart*, 554 F.2d 264, 267–68 (6th Cir. 1977)).

1.  Crawford questions the reliability of the affidavits underlying the first two warrants.  All agree that those affidavits turned on information provided by Heard.  And, says Crawford, Heard was unreliable.

Given the vital role confidential informants can play in furthering criminal investigations, we have carefully balanced what measures are necessary to validate an informant's reliability.  *See, e.g.*, *United States v. Kinison*, 710 F.3d 678, 683 (6th Cir. 2013).  By and large, our focus is on verifying the reliability of the informant, as opposed to the information obtained therefrom.  *See id.*  After all, verifying each individual piece of information obtained from an informant would be impractical, if not impossible.  *See id.*  Some information might not be verifiable, such as whether an informant drew a certain inference from an ambiguous statement by a suspect.  For other kinds of information—for example, when an informant claims to have personally seen contraband—verification is the purpose of the search warrant itself.  And more broadly, requiring verification of each piece of evidence would largely vitiate the very purpose of the confidential informant:  to give officers information they could not otherwise obtain.

So we examine the messenger more than the message.  Our focus is on the informant's reliability.  And different circumstances require different means for verifying an informant's reliability.  We begin by examining the known facts and circumstances regarding the informant.  *See United States v. Jackson*, 470 F.3d 299, 307 (6th Cir. 2006).  An easier case for verification is one in which an officer uses a confidential informant known to that officer.  In that setting, we typically do not require the officer to verify independently any of the information provided by the informant.  *Allen*, 211 F.3d at 976.  *Allen* is one example.  There, we did not require independent corroboration of information received from a confidential informant because the

informant, for "over a five-year period," was "personally known to the detective who swore the affidavit." *Id.*; *see also United States v. Pinson*, 321 F.3d 558, 563 (6th Cir. 2003) (finding probable cause to issue search warrant where "the officers personally knew the confidential informant . . . and characterized the informant as reliable"). That familiarity alone was enough to deem the informant reliable, for purposes of establishing probable cause.

Next, consider the instance where the informant is known to other law enforcement officers, but not to the affiant officer. If the affiant officer avers that another officer has vouched for the informant's reliability, that too will typically satisfy our reliability inquiry. *See United States v. Brown*, 732 F.3d 569, 574 (6th Cir. 2013) (citation omitted) (Officer's "statement that he was personally aware that the informant had provided information leading to convictions of at least two federal defendants suffices [] to establish that the informant . . . was reliable."); *see also United States v. Greene*, 250 F.3d 471, 480 (6th Cir. 2001) (Officer "averred that the confidential informant had assisted federal and state law enforcement officials in the past and this information had resulted in numerous felony arrests," meaning "the magistrate could reasonably have relied on the information gained from the confidential informant for the purposes of the search warrant.").

We have distinguished these settings from one in which an officer relies upon information from an informant the officer is using for the first time, and whose credibility the officer cannot verify through other officers. In that instance, there is no track record of credibility to fall back on. We thus require the officer to take steps to test the informant's veracity. *See United States v. Hammond*, 351 F.3d 765, 772 (noting that when an affidavit contains vague information from an informant who is not known to the police or known to be reliable, the informant's "tip can take on an increased level of significance for probable cause purposes, if corroborated by the police through subsequent investigation"). For example, the officer could verify key information received from the informant, where plausible to do so. *Compare United States v. May*, 399 F.3d 817, 825 (6th Cir. 2005) (finding affidavit sufficient where informant stated that the defendant worked with known cocaine cook at a certain location, officers saw the cook at said location, and officers knew of the cook's prior drug activities), *with Frazier*, 423 F.3d at 532 (finding affidavit insufficient where it set forth neither that officers

previously worked with informant nor any actions taken by officers to corroborate information received from informant).  Or the officer could identify multiple sources providing the same information, increasing the likelihood that the tip is reliable.  *See, e.g.*, *United States v. Woosley*, 361 F.3d 924, 927–28 (6th Cir. 2004) (finding affidavit sufficient where it included that officer previously received information from other informants regarding drug activities at defendant's business location and other officers had previously received similar tips).

2.  Before their investigation of Crawford, neither Nelson nor Boyd knew Heard personally. That means, in view of the legal landscape set out above, the two officers were required to verify in some manner Heard's reliability.  To our eye, the officers cleared that hurdle, and by some margin.

Up first are the warrants to track Crawford's phone and car, respectively.  For the warrant application to track Crawford's phone, Nelson, in his attached affidavit, stated that Heard provided Nelson with specific incriminating evidence.  For example, Crawford revealed to Heard (and Heard in turn revealed to Nelson) particular details of Crawford's drug-trafficking operation.  Those details included the price Crawford would need to pay to purchase a large amount of cocaine as well as the per-ounce price to sell that cocaine to Heard.  Heard also told Nelson that Crawford appeared to be buying the cocaine from an organization in Columbus.

Nelson likewise included in his affidavit the steps he took to confirm Heard's reliability. Nelson inquired about Heard to other officers who had previously used Heard as an informant, each of whom confirmed Heard's reliability.  That confirmation alone can be compelling evidence of an informant's reliability.  *See Brown*, 732 F.3d at 574.  Nelson also stated that Heard identified Crawford from his driver's license photo.  And, Nelson added, Heard provided him with Crawford's telephone number, reaffirmed that number a second time, and then a third time, showing Nelson text messages between Heard and Crawford.  Nelson, for his part, independently examined Crawford's background, discovering Crawford's criminal past, which included drug trafficking.

This affidavit comfortably passes indicia-of-reliability muster.  Presented with the information above, a reasonable judicial officer would have no trouble concluding there was a

"fair probability" that tracking Crawford's cellphone would aid an investigation into his criminal activities. *Higgins*, 557 F.3d at 389. As Heard was not known to Nelson, Nelson confirmed Heard's reliability with other law enforcement agencies, and independently corroborated key information provided by Heard. In view of these efforts, Heard's reliability was sufficiently established.

Much the same is true for the second warrant, one that authorized placing a GPS tracker on Crawford's vehicle. In his supporting affidavit, Boyd included the information relayed to him by Nelson. Added to that information were the facts that Heard had identified Crawford's vehicle, that the vehicle was registered to Crawford, and that Nelson saw Crawford drive the vehicle. Boyd also detailed the actions Nelson had taken to confirm Heard's reliability. Here too, the judicial officer had ample reliable evidence to justify issuing the GPS-related warrant.

Crawford has not convinced us otherwise. Relying on *United States v. Pelham*, 801 F.2d 875 (6th Cir. 1986), Crawford argues that the affidavit was silent as to whether Heard in fact observed any criminal activity himself. That silence, says Crawford, makes it uncertain whether Heard had first-hand information justifying the warrant, or merely circumstantial information of criminal conduct. And that lack of clarity, Crawford says, dooms the case for probable cause justifying the warrant. But *Pelham* cannot bear such weight. *Pelham* makes the perhaps unassailable observation that an informant who sees criminal activity can provide a substantial basis for finding probable cause. *Id.* at 878. Yet neither that case, nor any other case, to our knowledge, establishes a bright-line rule that first-hand knowledge of criminality is necessary to establish probable cause. To the contrary, in the over three decades that followed *Pelham*, we have not required informants personally to observe contraband or criminal activity before a court may find probable cause based on an informant's statement. *See, e.g.*, *United States v. Smith*, 510 F.3d 641, 653 (6th Cir. 2007) (citing *United States v. King*, 227 F.3d 732, 742 (6th Cir. 2000) (holding that the totality of the circumstances supported probable-cause determination despite confidential informant's lack of personal observation of criminal activity)). All that is required is that the totality of the circumstances satisfy the probable-cause standard. *Id.*

3. Regarding the third warrant—the warrant to search Crawford's home—Crawford claims there was no nexus between his home and his then-known criminal conduct, meaning that

affidavit too did not sufficiently establish probable cause justifying the ensuing search. With respect to this argument, however, Crawford finds himself behind immediately out of the starting block. Crawford forfeited this argument by not raising it below, meaning we review it only for plain error. *See United States v. Al-Maliki*, 787 F.3d 784, 791 (6th Cir. 2015). And establishing plain error is a tall order. Plain error means an "(1) error (2) that was obvious or clear, (3) that affected defendant's substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc) (internal quotation omitted).

Turning to the merits of Crawford's challenge, he contests whether probable cause existed to justify a warrant authorizing the search of his home. Generally speaking, to find probable cause justifying a warrant, we require a "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). That general rule is refined when the place is a home and the evidence drugs. "[I]n the case of drug dealers," we have observed, "evidence is likely to be found where the dealers live." *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998) (citation, internal quotations, and alteration omitted). And so a court issuing a search warrant "may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking." *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008).

Boyd's affidavit addressed the relationship between Crawford's home and his suspected drug dealing. In his affidavit supporting the request for a warrant to search Crawford's home, Boyd included the information used in seeking the earlier cellphone-tracking and GPS warrants. The affidavit detailed a phone conversation that led to the controlled cocaine buy between Crawford and Heard, as well as, more importantly, the actual controlled buy. On top of that, the affidavit explained that Heard told officers that Crawford kept his supply of cocaine in a duffle bag—something officers observed right before the controlled buy when Crawford left his apartment carrying a duffle bag.

Against this backdrop, we cannot say the district court erred, plainly or otherwise, in denying Crawford's motion to suppress. Heard was demonstrably a reliable source of information, as reflected in the first two warrants. And the third warrant, it bears adding, was

also supported by Heard's first-hand account of purchasing cocaine directly from Crawford. In view of that statement, a judicial officer could reasonably "infer that [Crawford] use[d his] home[] to store drugs and otherwise further [his] drug trafficking." *Williams*, 544 F.3d at 687. Accordingly, Crawford's Fourth Amendment challenge fails here as well.

## B.       Crawford Is Not Entitled To A *Franks* Hearing.

Crawford also challenges the validity of the third warrant on the grounds that it was premised upon a knowingly and intentionally false statement in the underlying affidavit. Crawford singles out the statement in the affidavit asserting that Heard and Crawford arranged to meet for a drug transaction. Because there was no express mention of drugs in the monitored phone call in which Crawford and Heard discussed meeting at the gym, Crawford says the corresponding statement in the affidavit is untruthful. Accordingly, Crawford requests a hearing to test how that false statement impacted the evidence-gathering process. *See Franks v. Delaware*, 438 U.S. 154 (1978).

The type of hearing Crawford seeks has come to be known as a "*Franks* hearing," following the Supreme Court's holding in a case by that name. In a *Franks* hearing, a court determines whether to suppress the fruits of an executed search warrant, where the warrant was the result of a false statement. *Id.* at 171. To demonstrate entitlement to the hearing, a defendant must make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Id*. at 155–56. "The allegedly false statement," moreover, must be "necessary to the finding of probable cause." *Id.*

A *Franks* analysis turns on two questions of fact, and one of law. The two questions of fact: One, is there a false statement included in an affidavit? If so, then two, how culpable is the affiant officer in including that statement in the affidavit? Where the affidavit does include a false statement, and where the officer making the statement was culpable in doing so, then the court turns to a question of law: After excising the false statement, is there sufficient information in the affidavit to constitute probable cause to issue a warrant? *Id.* at 171.

That legal question alone dooms Crawford's request for relief. Assuming, for argument's sake, that Crawford can meet his burden on the factual issues, he cannot meet his burden on the legal one. After all, even if the statements at issue were false, and even if Boyd had some culpability in including them in his affidavit, the affidavit contained an ample amount of other evidence to support a finding of probable cause to search Crawford's home. It explained that Heard and Crawford had discussed the price at which Crawford would sell cocaine to Heard as well as the organization from which Crawford would buy that cocaine. And it explained the details of the controlled buy in which Heard claimed to have purchased cocaine from Crawford.

The truthful evidence in the affidavit thus outweighs any concern over the inclusion of arguably false content. It follows that, after excising any mention of the phone call, the district court still had sufficient evidence upon which to find probable cause. Accordingly, we reject Crawford's claim that he should be afforded a *Franks* hearing.

**C.    Crawford Is Not Entitled To Relief On His *Miranda*-Based Claims.**

1. Crawford next contends that the district court should have suppressed his incriminating statements made to police officers while in custody. Primarily, Crawford contends that the officers did not read him his *Miranda* rights prior to his custodial interrogation. Before the district court, the parties presented dueling stories over whether the officers in fact read Crawford his *Miranda* rights. Crawford testified they did not. But both officers testified that they did. The district court credited the officers' testimony and concluded that Crawford was Mirandized prior to incriminating himself.

At this stage of the proceedings, Crawford has his work cut out for him in challenging the conclusion below. On the one hand, we review de novo a district court's legal conclusions with respect to whether to suppress statements allegedly taken in violation of *Miranda*. *United States v. Al-Cholan*, 610 F.3d 945, 953 (6th Cir. 2010) (internal citations omitted). Yet on the other, we defer to the district court's assessment of witness credibility, we "review the evidence in the light most likely to support the district court's decision," and we assess the entire record "in the light most favorable to the government." *United States v. Lawrence*, 735 F.3d 385, 436 (6th Cir. 2013) (internal citations omitted).

Crawford's climb is simply too steep. Crawford's best evidence is a recording made while he was being questioned in a police car. In that recording, Deputy Canfield mentions that he did not know whether Crawford had been Mirandized. But weigh that equivocal statement against the unequivocal testimony from two other officers, each of whom testified that Crawford had been Mirandized. The best Crawford can say, then, is that the district court was presented with conflicting testimony.

In weighing each witness's credibility, the district court is afforded deference. That means Crawford must demonstrate clear error in the district court's assessment for us to overturn that court's decision. *See id.* He has not done so. Accordingly, Crawford's motion to suppress was properly denied.

2. As a second *Miranda*-based challenge, Crawford alleges that he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights. Yet Crawford did not preserve that argument. In the proceedings below, Crawford failed to object to the magistrate judge's rejection of his "voluntarily and knowingly" challenge. When an unsuccessful party, with the benefit of time, fails to object to an aspect of a magistrate judge's ruling when that ruling is taken up by the district court, that party also waives any future objection to that particular ruling. *United States v. Wandahsega*, 924 F.3d 868, 878 (6th Cir. 2019) (internal citations omitted); *see also United States v. Soto*, 794 F.3d 635, 649 (6th Cir. 2015) ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right.") (internal quotations omitted).

In the proceedings below, the magistrate judge ruled, among other things, that "Crawford voluntarily, knowingly, and intelligently waived his [*Miranda*] rights." Crawford objected to several of the magistrate judge's recommendations, just not the one articulated here. That failure led the district court to conclude that Crawford had waived any challenge to the magistrate judge's determination. We agree.

**D.      The Prosecutor Did Not Improperly Bolster Informant Heard's Credibility.**

Crawford's final claim is that the prosecutor engaged in misconduct when questioning Nelson at trial.  According to Crawford, the prosecutor's questions of Nelson improperly buttressed or "bolstered" Heard's credibility.

Here again, Crawford's trial decisions have raised the bar on appeal.  Because Crawford did not object at trial to the prosecutor's questions he now takes issue with, his bolstering claim was forfeited, meaning that we will review the issue only for plain error.  Again, plain error means an "(1) error (2) that was obvious or clear, (3) that affected defendant's substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *Vonner*, 516 F.3d at 386 (internal quotation omitted).

At trial, a party's case often rises or falls with the strength of its witnesses.  Trial lawyers thus well understand the need for their witnesses to come across as credible.  And so the Federal Rules of Evidence as well as generally accepted trial practices more broadly allow some room for trial lawyers to portray a witness in the best light.  As just a few examples, a lawyer, through her questioning, may seek to highlight a witness's specialized expertise or a witness's unusually compelling reasons to be truthful when testifying.

Sometimes, those efforts can go too far.  Evidentiary rules along with accepted standards of courtroom decorum help curtail abusive courtroom antics.  In the criminal setting specifically, we have drawn a hard line against overzealous efforts by prosecutors to prop up a testifying witness by "bolstering" on her behalf.  *United States v. Francis*, 170 F.3d 546, 549–51 (6th Cir. 1999).  "Bolstering occurs when the prosecutor implies that the witness's testimony is corroborated by evidence known to the government but not known to the jury." *Id.* at 551 (citing *United States v. Sanchez*, 118 F.3d 192, 198 (4th Cir. 1997)).  Bolstering is treated as a form of prosecutorial misconduct as it goes to "the heart of a fair trial." *Id.*  When bolstering occurs, it can lead to reversal of a conviction.

 In analyzing whether impermissible bolstering occurred during trial, a reviewing court must first determine whether the challenged statements were improper.  The most common type of impropriety in this context is when a prosecutor asks a witness, typically a law enforcement

official, "whether [the official] was able to corroborate what he learned in the course of a criminal investigation." *Id.* (citing *United States v. Lewis*, 10 F.3d 1086, 1089 (4th Cir. 1993)). While that statement, standing alone, may not reflect misconduct, the statement falls below acceptable standards when the prosecutor then fails to "draw out testimony explaining how the information was corroborated and where it originated." *Id.*  Where that pattern of conduct arises, a court must determine whether a prosecutor's remarks constituted flagrant misconduct, or instead, something more benign, possibly even an oversight.  *See United States v. Bradley*, 917 F.3d 493, 505 (6th Cir. 2019) (citing *United States v. Henry*, 545 F.3d 367, 376 (6th Cir. 2008)).

*Francis* is one such example of misconduct that was more than an oversight.  There, the prosecutor repeatedly asked the law enforcement witness "whether he had corroborated information [he] obtained."  170 F.3d at 551.  On two occasions, the agent explained that "police reports, bank records, tax records, and interviews and conversations with other individuals," as well as a controlled drug-buy, led him to believe the information he obtained was reliable.  *Id.* But on at least *twelve other similar occasions*, the agent merely asserted, without more, that he had corroborated the information he received.  *Id.*  The prosecutor's failure in turn to elicit evidence as to how the information was corroborated, we acknowledged, "would lead a reasonable juror to believe that the prosecutor was implying a guarantee of truthfulness based on facts outside the record."  *Id.*  For that reason, we held that the prosecutor's line of questioning was improper.  *Id.*  And in the context of the entire trial, because the prosecutor's failure to "refrain from improper methods" was "pervasive[] and repeated[]," a new trial was necessary. *Id.* at 553.

But that was *Francis*.  Today, on the other hand, we need not assess whether the prosecutor engaged in flagrant misconduct below, for Crawford has failed make the threshold demonstration that the prosecutor's questions were improper.  The prosecutor elicited testimony along the lines of a statement by Nelson that Heard was a reliable and trustworthy source of information.  That line of questioning is proper if the prosecutor then "dr[e]w out testimony explaining how the information was corroborated and where it originated."  *Id.*  Below, the prosecutor drew out such testimony:

Q. Okay. Now, why did -- why had you used Jerry Heard on multiple occasions in the past?

A. I'd used him on occasion in the past. His information that he's given me was reliable. The cases, you know, the calls, meeting individuals, retrieving the illicit narcotics from individuals after the deal, it was all reliable and trustworthy.

Q. What if you determined that a CI -- Mr. Heard in this case, but a CI in general, what if you determined that that CI is lying to you?

A. I stop using informants if they're lying about their activities or any criminal activities. It's best practice just to stop using them.

Q. If a CI is doing work for multiple agencies, as we've heard you testify that Mr. Heard was doing here, what does that reveal to you about the CI?

A. That if -- typically, other agencies will call each other. In this case, I contacted Agent Josh Schlie with BCI and spoke with him directly before using Jerry on my first occasion, and Agent Schlie vouched that Jerry was a reliable, trustworthy informant, and he'd used him in the past.

* * *

Q. You just testified that Mr. Heard provided reliable information to you in the past. Did he provide reliable information to you in this case?

A. Yes.

Q. Had Mr. Crawford, in fact, sold cocaine in the past?

A. Yes.

Q. And Mr. Heard provided you with that information, correct?

A. Well, yes. He provided that information, plus I looked up Mr. Crawford's criminal history and verified it myself.

Q. Okay. Mr. Crawford did, in fact, live in Florence, Kentucky; is that correct?

A. That is correct.

Q. And the CI provided you with that information, correct?

A. He knew that Crawford was living in Kentucky. He didn't know specifically where.

Q. Okay. Did Mr. Crawford drive the car that the CI said he was, the BMW?

A. Yes.

This exchange, unlike the one in *Francis*, safely falls on the right side of the propriety line. While the prosecutor questioned Nelson as to whether Heard was reliable, the prosecutor

also asked several questions to draw out why Nelson had reached that conclusion. Nelson in turn explained the steps he had taken to confirm Heard's past reliability as well as his efforts to corroborate information Heard had provided about Crawford. Finally, Nelson listed information provided by Heard that had proved both true and relevant to the investigation. As these efforts reflect, the prosecutor did not "lead [the jury] to believe that [he] was implying a guarantee of truthfulness based on facts outside the record." *Francis*, 170 F.3d at 551. Rather, he emphasized how the record validated the informant's credibility. Because the facts demonstrating why Heard was truthful and reliable were presented to the jury, no plain error occurred.

## III. CONCLUSION

For these reasons, we **AFFIRM** the judgment of the district court.