NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0152n.06

No. 20-1276

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 23, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE WESTERN DISTRICT OF |
| | ) | MICHIGAN |
| JAMES JUNIOR MILLER, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: CLAY, McKEAGUE, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. To obtain a search warrant under the Fourth Amendment, the police must have "probable cause" that the "place" they seek to search contains the "things" they seek to seize. U.S. Const. amend. IV. Applying this test, we have repeatedly held that probable cause exists to search a residence for drug-related evidence when a drug dealer travels directly from that residence to the site of a drug deal. *See, e.g.*, *United States v. Coleman*, 923 F.3d 450, 457–58 (6th Cir. 2019); *United States v. Ellison*, 632 F.3d 347, 349 (6th Cir. 2011). The facts of this case fit that profile: Just before his arrest, the police watched James Miller leave an apartment with a grocery bag, drive to a nearby parking lot, and sell drugs. The district court thus correctly held that probable cause supported a warrant to search the apartment. We affirm Miller's conviction.

I

In September 2017, police officers in Lansing, Michigan, stopped a car that Miller was driving because the car had illegally tinted windows and Miller had failed to use a turn signal. The officers smelled marijuana during the stop, searched the car, and discovered cocaine and marijuana inside. Miller was arrested and released on bond.

Fast forward ten months to July 2018. Officers arranged for a confidential informant to buy 1.5 ounces of cocaine from Miller for $1,800. The officers monitored the controlled buy. Not wanting to blow the informant's cover, they next had a uniformed officer pull Miller over for a traffic violation. This officer asked Miller to exit the car after noticing three baggies of what appeared to be cocaine in the center console. Miller refused. When backup arrived, several officers physically extricated him. A search of the car revealed a large amount of cocaine. Miller was again arrested and released on bond.

Fast forward a few more weeks. Miller failed to appear on state drug charges for his offenses. A judge issued a bench warrant for his arrest. On the early afternoon of August 17, officers were surveilling the apartment at which they suspected Miller had been staying.

An officer's affidavit seeking a warrant to search this apartment described what happened next. Officers watched Miller exit and reenter the apartment talking on his phone. He later left the apartment carrying a white plastic grocery bag and stopped to check the bag's contents as he walked to his car. Miller got into his car and drove to a nearby store's parking lot. Miller parked in the lot but remained in the car. Officers looked on as an individual got into Miller's car and left a minute later. They next saw a second person enter his car. At this point, several officers approached the vehicle both on foot and in a patrol car. An on-foot officer saw cocaine in Miller's hand and plastic baggies with more cocaine and cash next to him. Miller attempted to hide the

2

cocaine. He then put his car in reverse and hit the patrol car behind him. Officers arrested Miller. A search of his car uncovered large amounts of suspected cocaine and marijuana, packaging materials, and a digital scale. The search also uncovered a firearm and cash in the white plastic bag that Miller had been carrying from the apartment.

Aside from these events, the affidavit noted that a bench warrant had been issued for Miller's arrest "on a previous drug case." It also explained that officers had continued to surveil the apartment at which they had found Miller and that no other person had been seen entering or leaving it. The officer who signed the affidavit opined that the drugs recovered from Miller's car likely originated from this apartment. The officer added that, in her experience, drug dealers often keep firearms, drugs, and drug proceeds in their homes. She sought a warrant to search the apartment for evidence of Miller's drug dealing.

A magistrate judge issued the warrant. Officers conducted the search the same day. They recovered two handguns (one of which had been reported stolen), ammunition, and 403.54 grams of cocaine.

Miller was indicted on several counts. He moved to suppress the evidence seized from the apartment on the ground that the officer's affidavit did not establish probable cause to search it. The district court denied his motion.

After that denial, Miller entered into a conditional plea agreement. He pleaded guilty to possessing with the intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1), and possessing a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). Miller reserved the right to challenge the district court's denial of his motion to suppress on appeal. The district court subsequently sentenced him to 190 months' imprisonment.

Miller now appeals the denial of his motion to suppress. We give de novo review to a district court's denial of such a motion when it is based on the legal conclusion that probable cause existed for a search. *See United States v. Brown*, 732 F.3d 569, 572–73 (6th Cir. 2013).

II

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. amend. IV. The Supreme Court has long interpreted this language to prohibit the issuance of a search warrant unless there is probable cause to believe that the place to be searched contains the things to be seized. *See Zurcher v. Stanford Daily*, 436 U.S. 547, 555–56 (1978). Or, as our precedent puts it, there must be a probable-cause "nexus" between a defendant's alleged illegal activity and the relevant location. *See Ellison*, 632 F.3d at 349. This nexus requires a "fair probability" that the location will contain evidence of the illegal activity. *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Miller argues that the police failed to establish the required nexus between his drug dealing in the store's parking lot and the apartment that they sought to search. When considering whether a nexus exists to search a particular place, we may look only to the evidence presented under oath to the magistrate who issued the warrant (here, the testimony provided by the officer in the affidavit). *See United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009). Although we review the district court's decision de novo, we "give great deference" to the magistrate's conclusion that probable cause existed to issue the warrant. *Brown*, 732 F.3d at 572–73. Our job "is simply to ensure that the magistrate had a substantial basis for" this conclusion. *Carpenter*, 360 F.3d at 594 (quoting *Gates*, 462 U.S. at 238–39).

4

This "nexus" question arises often in the drug-trafficking context. *See, e.g.*, *United States v. Sumlin*, 956 F.3d 879, 885–87 (6th Cir. 2020); *United States v. Crawford*, 943 F.3d 297, 308–09 (6th Cir. 2019); *Coleman*, 923 F.3d at 457–58; *United States v. Houser*, 752 F. App'x 223, 226–27 (6th Cir. 2018); *United States v. Jenkins*, 743 F. App'x 636, 642–44 (6th Cir. 2018); *United States v. Brown*, 828 F.3d 375, 381–85 (6th Cir. 2016); *United States v. McPhearson*, 469 F.3d 518, 524–25 (6th Cir. 2006). In some circumstances, we have "struggled to identify the quantum of evidence" required for probable cause to search a drug dealer's home. *United States v. Ardd*, 911 F.3d 348, 351 (6th Cir. 2018). Yet our cases leave no doubt that probable cause may exist if the evidence provided to a magistrate "directly connect[s] the residence with the suspected drug dealing activity[.]" *Brown*, 828 F.3d at 384.

The police often establish this type of direct connection to a residence with evidence that a drug dealer took drugs from that residence to a drug deal. *See id.* at 383. Consider *Houser*. There, an affidavit "averred that officers witnessed Houser leave from and then return to his apartment immediately before and after selling crack cocaine, thus establishing a sufficient nexus to search the residence" for drug-related evidence. 752 F. App'x at 227. Or consider *Ellison*. There, "[t]he affidavit explained that a confidential informant had observed someone come out of Ellison's residence, engage in a drug transaction, and then return into the residence." 632 F.3d at 349. We likewise held that these facts created "a fair probability that drugs were being stored in the residence or that drug trafficking was taking place from the residence[.]" *Id.*

Admittedly, the drug transactions in *Houser* and *Ellison* occurred just outside the residence. But we have invoked the same principle when the defendant traveled farther away from the residence to a drug deal. Take *Crawford*. Police officers in that case received information from a credible informant that Crawford was selling cocaine. 943 F.3d at 302. They thus worked with

the informant to set up a controlled buy at a gym. *Id.* at 303. The officers watched Crawford exit his apartment for the gym with a small duffle bag and later confirmed with the confidential informant that the buy had gone through. *Id.* We held that this evidence sufficed to connect Crawford's drug dealing with this apartment. *Id.* at 308–09. Or take *Coleman*. Police officers in that case had arranged for several controlled buys from Coleman. 923 F.3d at 457. Before the last controlled buy, the officers "observed [Coleman] drive directly from his condo to the" designated site. *Id.* We held that this evidence established a sufficient nexus to the condo because it allowed for "a reasonable inference that he transported narcotics from his residence to the location of the cocaine sale." *Id.*; *see also Sumlin*, 956 F.3d at 887; *Jenkins*, 743 F. App'x at 644.

Miller's case resembles these cases in all the ways that matter. Police officers established Miller's connection to the apartment when they watched him exit and reenter the apartment and eventually leave it carrying a white plastic grocery bag. *Cf. Crawford*, 943 F.3d at 308–09. They next saw Miller get into his car and drive directly to a parking lot where he engaged in suspected drug sales. *Cf. Coleman*, 923 F.3d at 457. They then found a large quantity of drugs in the car at the site of these sales and a firearm and cash in the bag that he had been carrying from the apartment. As in our other cases, this direct line from the apartment to the drug deals sufficed to create a fair probability that evidence would be found in the apartment. And Miller should not be able to avoid that conclusion simply by undertaking his drug deals at a nearby parking lot rather than at the apartment. *See Jenkins*, 743 F. App'x at 644. Probable cause thus supported the warrant.

Miller's contrary arguments are unconvincing. Miller initially argues that the affidavit lacked sufficient evidence to indicate that he lived at this apartment. Yet such a connection was unnecessary on this case's facts. Search warrants are directed at places, not people. *Zurcher*, 436

U.S. at 555. To search a property, therefore, the police need not establish probable cause that the property's "owner or occupant" is engaged in criminal activity. *See id.* at 556. In *Ellison*, for example, the confidential informant who saw a drug deal occur outside a home identified the man who exited the home and sold the drugs only by his nickname ("Short"). 632 F.3d at 348, 350. The affidavit did not indicate that "Short" lived at this home or otherwise explain his connection to it. *Id.* at 350. That did not matter. "[A]n affidavit in support of a search warrant does not need to name or describe the person who sold the drugs or name the owner of the property[.]" *Id.* (quoting *United States v. Pinson*, 321 F.3d 558, 564 (6th Cir. 2003)). Here, too, the evidence that Miller carried a white grocery bag out of this apartment and traveled straight to the site of drug deals created a fair probability that the apartment contained evidence of Miller's drug dealing. *Cf. United States v. Christian*, 925 F.3d 305, 310 (6th Cir. 2019) (en banc); *United States v. Burney*, 778 F.3d 536, 539–40 (6th Cir. 2015).

Miller next argues that he engaged in only "innocuous activity" (such as talking on his phone) while at the apartment and that no drug activity occurred there. "But such a level of involvement is not required for a finding of probable cause." *Jenkins*, 743 F. App'x at 644. Contrary to Miller's claim, moreover, the affidavit provided more than a "mere belief" that drugs would be found at his apartment. His direct path from the apartment to the drug deals (carrying a white bag) was objective evidence connecting the apartment to that drug dealing under our caselaw. *See Crawford*, 943 F.3d at 308–09; *Coleman*, 923 F.3d at 457. This caselaw makes good sense. "Drug dealers cannot immunize themselves from [a] search of a residence used to store their supply simply by ensuring that all drug deals take place in parking lots." *Jenkins*, 743 F. App'x at 644. That principle reaches Miller's drug deals in the parking lot in this case too.

We affirm.